**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE ASSOCIATED PRESS; CABLE NEWS NETWORK, INC.; THE NEW YORK TIMES CO.; POLITICO LLC; AND WP CO., LLC, d/b/a THE WASHINGTON POST FOR ACCESS TO CERTAIN SEALED COURT RECORDS** | **Case No. 1:18-mc-41 (ABJ)** |

**GOVERNMENT'S RESPONSE TO MOTION**
**FOR PUBLIC ACCESS TO CERTAIN SEALED COURT RECORDS**

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this response to the motion by a coalition of five media companies to unseal search warrant materials and other court records in the Special Counsel's investigation. The movants seek unsealing of (1) the warrants, applications, supporting affidavits, and returns relating to all search, seizure, and Stored Communications Act warrants pertaining to the Special Counsel's investigation into Russian efforts to interfere in the 2016 presidential election; and (2) certain records from the pending prosecution in *United States v. Manafort*, No. 17-cr-201-ABJ (D.D.C.), including sealed hearing transcripts. The request for broad unsealing of search warrant materials should be denied. The Special Counsel's investigation is not a closed matter, but an ongoing criminal investigation with multiple lines of non-public inquiry. No right of public access exists to search warrant materials in an ongoing investigation.

A First Amendment right of access can be found only where a long and unbroken history of public access exists and where access would play a significant positive role in the governmental process. Neither requirement is satisfied here. Search warrant materials regularly remain sealed while investigations are ongoing. And a right of public access risks jeopardizing open investigations. That remains true even though some aspects of the investigation have resulted in

charges; the overall investigation is not complete, and the search warrant materials relate to that ongoing investigation.  In any event, substantial law-enforcement interests would overcome any qualified First Amendment right of access.

The same is true of movants' reliance on the qualified common law right of access to public records.  That right is subject to a balancing of interests, and here, strong public interests support finding no right of public access at this time.  Warrant materials reveal investigative sources and methods, preliminary factual and legal theories, and evidence that has already been gathered— including from grand jury processes.  They show what has been searched—including electronic facilities where the search itself is protected by a non-disclosure order—and indicate what has not been searched.  And the dates and volume of warrants reveal an investigation's direction.  Making this information public while an investigation is ongoing could harm the government's ability to uncover all relevant facts.  Where, as here, search warrant materials are interwoven with highly sensitive investigatory information, the possibility of line-by-line redactions would not be practicable.

The government does not oppose unsealing, with appropriate redactions, the two warrant applications that are the subject of motions to suppress in the *Manafort* case.  Those materials are directly at issue in judicial proceedings.  Through briefing and argument, many relevant facts have or will soon become public.  And for those two warrants, it would be possible to redact information that, if disclosed, would harm the broader, ongoing investigation.[1]

---

[1] The government takes no position on whether the court should unseal the other records that movants have called the "Manafort Records," which include several transcripts and one exhibit filed by Gates's former attorney.  In contrast to warrant materials, those records are judicial records that directly relate to the criminal proceeding.  The government has access to only some of those records and understands that they were sealed to protect the interests of the defendants in that case.

## BACKGROUND

### A.      The FBI's Investigation And The Appointment Of The Special Counsel

On March 20, 2017, then-FBI Director James B. Comey testified before the House Permanent Select Committee on Intelligence about the FBI's investigation into Russian interference with the 2016 presidential election.  In open session, Comey stated:

> I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.

Statement of FBI Director James B. Comey, H. Perm. Select Comm. on Intelligence, *Hearing on Russian Active Measures Investigation* (Mar. 20, 2017), *available at* https://www.fbi.gov/news/ testimony/hpsci-hearing-titled-russian-active-measures-investigation.  Comey further stated that "[a]s with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed."  *Id.*  He could not "say more about what [the FBI is] doing and whose conduct [it is] examining" because "it is an open, ongoing investigation, and is classified."  *Id.*

On May 17, 2017, Acting Attorney General Rod J. Rosenstein issued an order appointing Robert S. Mueller, III, as Special Counsel "to investigate Russian interference with the 2016 presidential election and related matters."  Order No. 3915-2017 (capitalization omitted), *available at* https://www.justice.gov/opa/press-release/file/967231.[2]  "The Special Counsel," the Order

---

[2] Deputy Attorney General Rosenstein was and is serving as Acting Attorney General for the Russia investigation because, on March 2, 2017, the Attorney General recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."  Press Release, U.S. Dep't of Justice, *Attorney General Sessions Statement on Recusal* (Mar. 2, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal. As the Attorney General noted, *id.*, the Deputy Attorney General in those circumstances exercises the authority of the Attorney General.  *See* 28 U.S.C. § 508; 28 C.F.R. § 0.15(a).

stated, "is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including:

> (i)    any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and
>
> (ii)   any matters that arose or may arise directly from the investigation; and
>
> (iii)  any other matters within the scope of 28 C.F.R. § 600.4(a).

*Id.* ¶ (b).[3]

As the Acting Attorney General has explained, the May 17, 2017 Appointment Order "was worded categorically in order to permit its public release without confirming specific investigations involving specific individuals." Memorandum from Rod J. Rosenstein to Robert S. Mueller, III, at 1 (Aug. 2, 2017) (*August 2 Memorandum*), *available at* Doc. 244-3, *Manafort, supra.* "[T]he specific matters" assigned to the Special Counsel were "not identified in the [May 17] order." Testimony of Deputy Attorney General Rod J. Rosenstein, H. Comm. on the Judic., *Hearing on the Justice Department's Investigation of Russia's Interference in the 2016 Presidential Election*, at 29 (Dec. 13, 2017), *available at* Doc. 244-2, *Manafort, supra.* Recognizing the need for confidentiality about the subjects of a criminal investigation, *id.* at 30, the Acting Attorney General "discussed that with [the Special Counsel] when he started" and has continued to have "ongoing discussion about exactly what is within the scope of his investigation," *id.* at 29; *see August 2 Memorandum* at 1, 3; *see also United States v. Manafort*, No. 17-cr-201-

---

[3] 28 C.F.R. § 600.4(a) confers "the authority to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses" and "to conduct appeals arising out of the matter being investigated and/or prosecuted."

ABJ, 2018 WL 2223656, at *1-*4 (D.D.C. May 15, 2018) (rejecting challenge to authorized scope of Special Counsel's investigation).

### B.      The Special Counsel's Ongoing Investigation

The Special Counsel's conduct of the investigation remains ongoing.  Among other things, the Special Counsel's Office is investigating avenues used by Russia to interfere in the 2016 U.S. presidential election, and links and/or coordination between Russia and individuals affiliated with the campaign of President Trump.  The investigation consists of multiple lines of inquiry within the overall scope of the Special Counsel's authority.  Many aspects of the investigation are factually and legally interconnected:  they involve overlapping courses of conduct, relationships, and events, and they rely on similar sources, methods, and techniques.  The investigation is not complete and its details remain non-public.[4]

In conducting the investigation, agents assisting the Special Counsel's Office have applied for, obtained, and executed search warrants under Rule 41 of the Federal Rules of Criminal Procedure as well as warrants under the Stored Communications Act (SCA) requiring the disclosure and authorizing the search of electronic communications contents and records, *see* 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  The issuing courts and magistrate judges have granted sealing orders covering the applications and warrants in order to prevent premature disclosures that would jeopardize the ongoing investigation.  As of this date, the government has brought criminal charges against 22 individuals and entities arising from the investigation.  *See*

---

[4] The government believes that this motion can be resolved based on the existing record, in light of the evident sensitive and interconnected nature of the Special Counsel's ongoing investigation.  The details of the investigation cannot be discussed in a public filing.  The government will, if requested by the Court for its consideration of this motion, provide a more detailed presentation of the investigation, the search warrant materials, and the bearing of the search warrant materials on that investigation in *ex parte* and sealed *in camera* proceedings.

Appendix A (listing defendants and charges).  The fact that certain charges have been brought does not imply that the Special Counsel's investigation into the assigned matters is closed.  Nor does it imply that the search warrant materials could be unsealed at this time without creating a serious risk of jeopardizing the ongoing and interconnected aspects of the investigation.  Although movants acknowledge that the Special Counsel's investigation is ongoing, Mem. 14, they nevertheless seek unsealing of a wide range of search warrant materials.

## ARGUMENT

Invoking both the First Amendment and the common law, movants seek unsealing of the search warrant materials in the Special Counsel's investigation, with redactions as needed "to protect the integrity of an ongoing investigation."  Mem. 10, 14-15.  That request should be rejected.  Courts have, virtually without exception, recognized that the First Amendment provides no right of access to search warrant materials during an open, ongoing investigation.  In any event, any such First Amendment right would be overcome by the compelling interests in protecting the criminal process and the rights of individuals.  The result has been the same under the broader, but weaker, qualified common law right of access to public records.  Disclosure at this juncture could reveal sources and methods, directions of inquiry, persons within the scope of the investigation, and other related law-enforcement matters that would prejudice important public interests in a fair and thorough inquiry.

Movants seek to advance the public's interest in understanding the dimensions of the Special Counsel's investigation.  Mot. 4.  That is an important and valuable function of the press.  But that interest does not take precedence over the strong public interest in protecting an ongoing criminal investigation against the prejudice from premature disclosure.  Because the law has long recognized that an investigation in progress cannot be conducted with the same openness as a

criminal trial, movants' broad request should be denied.  The government does not object, however, to releasing the two warrant applications that are the subject of motions to suppress in *United States v. Manafort*, with appropriate redactions.

**I.      The First Amendment Does Not Entitle Movants To The Unsealing Of Search Warrant Materials Relating To The Special Counsel's Ongoing Investigation**

The First Amendment protects a qualified "right of access to criminal proceedings," *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) (*Press-Enterprise II*), but that right does not apply to all phases of the criminal process.  The public possesses a qualified First Amendment right of access to judicial proceedings and records only if "(i) there is an 'unbroken, uncontradicted history' of openness, and (ii) public access plays a significant positive role in the functioning of the proceeding."  *United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion)).  Because the warrant materials sought here concern an ongoing investigation, neither requirement is satisfied.  But even assuming the existence of such a right, it would be overcome by compelling government interests in protecting the investigation's integrity against premature disclosure.

**A.      The Test For Identifying A First Amendment Right Of Access Turns On A History Of Openness And A Beneficial Effect On The Proceeding**

The First Amendment guarantees "the freedom of speech, or of the press."  U.S. Const., Amend. I.  As a means of furthering First Amendment interests, the Supreme Court has recognized an "implicit," qualified First Amendment "right of access" for the public to attend criminal trials.  *Press-Enterprise II,* 478 U.S. at 7 (first quotation from *Waller v. Georgia*, 467 U.S. 39, 46 (1984)); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603-606 (1982) (recognizing that "the press and general public have a constitutional right of access to criminal trials," to ensure an "informed" "discussion of governmental affairs").

Two features of criminal trials led to recognition of that right.  First, during an "unbroken, uncontradicted history" dating back centuries, criminal trials have "been open to all who care to observe" and public access "inher[ed] in the very nature of a criminal trial."  *Richmond Newspapers*, 448 U.S. at 564, 573 (plurality opinion); *accord Globe Newspaper*, 457 U.S. at 605 (criminal trials have "long been presumptively open," and that "uniform rule" is virtually without exception); *see* U.S. Const. Amend. VI ("the accused shall enjoy the right to a speedy and public trial").  Second, public access "to criminal trials plays a particularly significant role in the functioning of the judicial process" because scrutiny by the public "safeguards the integrity of the factfinding process," "fosters an appearance of fairness," and "permits the public to participate."  *Globe Newspaper*, 457 U.S. at 606; *accord Press-Enterprise II*, 478 U.S. at 8-9.

Applying those two considerations, the Supreme Court has found a First Amendment right of access to the jury-selection stage of criminal proceedings, *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 505-513 (1984) (*Press-Enterprise I*), and to the transcript of a "preliminary hearing" in a criminal case that "function[ed] much like a full-scale trial," *Press-Enterprise II*, 478 U.S. at 7.  The D.C. Circuit has also found a qualified First Amendment right of access to completed plea agreements.  *Brice*, 649 F.3d at 799.  But the Supreme Court has also recognized that "[a]lthough many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of governmental operations that would be totally frustrated if conducted openly."  *Press-Enterprise II*, 478 U.S. at 8-9.  As a "classic example" of a proceeding that demands secrecy, the Court pointed to the grand jury system.  *Id.* at 9 (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979)); *see Douglas Oil*, 441 U.S. at 218-219 (describing investigatory threats posed by revelation of grand jury proceedings); *see also Matter of Leopold to Unseal Certain Elec. Surveillance Applications*

& *Orders*, No. 13-mc-712-BAH, 2018 WL 1129660, at *18 (D.D.C. Feb. 26, 2018) (*Leopold*) (drawing analogy between SCA warrants and grand jury subpoenas, for which "[n]o historical tradition of public access" exists).

Accordingly, a claimed First Amendment right of access must meet a two-part "experience and logic" test. *Matter of the Application of WP Co. LLC*, 201 F. Supp. 3d 109, 117 (D.D.C. 2016) (*Matter of Washington Post*); *see Press-Enterprise II*, 478 U.S. at 8-9.  To meet the test of experience, the "historical tradition" of public access must be of "some duration," *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985), reflecting an "unbroken, uncontradicted history of openness," *Brice*, 649 F.3d at 795 (internal quotation marks omitted). To meet the test of logic, public access must play "a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8.  Both tests must be satisfied "before a constitutional requirement of access can be imposed." *Reporters Comm.*, 773 F.2d at 1332.

> **B**.     **The First Amendment Does Not Guarantee A Qualified Right Of Public Access To Warrant Materials In An Ongoing, Open Investigation**

Applying the "experience and logic" test, movants have no First Amendment right of access to warrant materials connected to an open criminal investigation.  Because the warrants all relate to the Special Counsel's ongoing criminal investigation, movants cannot invoke the First Amendment as a basis for unsealing.

1.  Initially, no "historical tradition of accessibility" attaches "to documents filed in search warrant proceedings." *In re Search of Fair Finance*, 692 F.3d 424, 431 (6th Cir. 2012); *see, e.g.*, *United States v. Pirk*, 282 F. Supp. 3d 585, 598-600 (W.D.N.Y. 2017).  Proceedings for the issuance of search warrants "are not, and have not been, public," and "are 'necessarily ex parte, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy

or remove evidence.'"  *Fair Finance*, 692 F.3d at 430 (quoting *Franks v. Delaware*, 438 U.S. 154, 169 (1978)).  And "no evidence" supports the conclusion that search warrant materials have "historically being made open to the press and public" after execution.  *Id.*; *accord In re Baltimore Sun Co.*, 886 F.2d 60, 64 (4th Cir. 1989).

Although warrant applications and returns are filed with district court clerks, "the government . . . routinely obtain[s] sealing orders," and given "the confidentialities involved in criminal investigations," courts have "generally afforded deference" to those requests.  *Fair Finance*, 692 F.3d at 431; *see also Leopold*, 2018 WL 1129660, at *15 (the government has "'always been able to restrict access' to SCA warrants . . . by requesting a sealing order") (quoting *United States v. Appelbaum*, 707 F.3d 283, 291 n.9 (4th Cir. 2013)).  It may be the case today that some search warrant affidavits are made available in the clerk's office after execution.  *Id.* at *16 (discussing contemporary practice as described by some courts).  But "the fact that the government may in some instances allow documents filed after the execution of the search warrant to become public" does not "evidence . . . an *historical* tradition of accessibility."  *Fair Finance*, 692 F.3d at 431 (emphasis added).

Nor does logic support a right of access to search warrant materials.  "[P]ublic access would not play a significant positive role in search warrant proceedings."  *Fair Finance*, 692 F.3d at 431.  Indeed, logic undercuts any such generalized right.  Even after warrants are executed, routine disclosure of the information contained in the documents would be harmful.  Warrant applications ordinarily "detail the government's evidence of criminal activity," "identify information sources, such as wiretaps," "reveal the government's preliminary theory of the crime being investigated," and "could alert others" who may be suspects.  *Id.* at 432.  Disclosure of this information could threaten investigations, invade the privacy of "innocent people," and force the government "to be

more selective in the information it disclose[s]" when seeking warrants. *Id.* And while public oversight of search warrant proceedings may encourage compliance with the law, such "monitoring of search warrant proceedings" already effectively occurs though suppression proceedings and damages actions. *Id.* at 432-433; *see United States v. Grubbs*, 547 U.S. 90, 99 (2006) (protection of property owners' Fourth Amendment rights occurs through "a right to suppress evidence improperly obtained and a cause of action for damages").

Consistent with that analysis, court after court has found "no First Amendment right of access to documents filed in search warrant proceedings." *Fair Finance*, 692 F.3d at 433 (6th Cir.); *accord Baltimore Sun Co.*, 886 F.2d at 62, 64-65 (4th Cir.); *see also, e.g., Pirk*, 282 F. Supp. 3d at 597-601 (collecting cases); *cf. Leopold*, 2018 WL 1129660, at *14-*19 (no First Amendment right for Stored Communications Act warrants).[5]

2. The consensus is even stronger with respect to search warrant materials in an ongoing investigation—as is the case here. The Court need go no farther to resolve this case.

a. Even those district courts that have found a qualified First Amendment right of access for "post-investigation warrant materials" have, to the government's knowledge, limited their holdings to warrant materials "after an investigation has concluded." *In re N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 88, 90 n.10 (D.D.C. 2008); *Matter of the Application of WP Co. LLC*, No. 16-mc-351-BAH, 2016 WL 1604976, at *2 & n.2 (D.D.C.

---

[5] *See also Times Mirror Co. v. United States*, 873 F.2d 1210, 1221 (9th Cir. 1989) ("The public has no qualified First Amendment right of access to warrant materials during the pre-indictment stage of an ongoing criminal investigation"). Only one court of appeals has recognized a qualified right of access in an open investigation, but it went on to deny access to the search warrant materials by the related route of finding that a compelling interest in the ongoing investigation justified non-disclosure. *See In re Search Warrant for Secretarial Area Outside Office of Thomas Gunn*, 855 F.2d 569, 573-574 (8th Cir. 1988). As other courts have noted, *Gunn*'s threshold access holding is "unpersuasive." *Fair Finance*, 692 F.3d at 433 n.3.

Apr. 1, 2016) (explaining that "courts have generally precluded access to warrant materials relating to an *ongoing* investigation" and emphasizing that the request involved a "now-closed" investigation); *see Leopold*, 2018 WL 1129660, at *1, *32 (noting different treatment for "ongoing investigations"); *Pirk*, 282 F. Supp. 3d at 600 (even assuming that a First Amendment right would otherwise exist, no right should be found where "the Government has consistently represented that the investigation is ongoing").

Declining to recognize any constitutional right of access to search warrant materials in open investigations correctly applies the experience-and-logic test. As a matter of practice, warrants typically are sealed while an investigation remains ongoing, so the public does not have access to them. *See Computer Prof'ls for Soc. Responsibility v. Secret Serv.*, No. 92-5140, 1993 WL 20050, at *1 (D.C. Cir. Jan. 5, 1993) (per curiam) ("[T]here is no clear tradition of public access to search warrant materials related to an ongoing investigation."); *see also United States v. Business of Custer Battlefield Museum*, 658 F.3d 1188, 1193 (9th Cir. 2011) (explaining, in analysis of common law right of access, that public access to warrant materials has historically varied between "early stages of criminal proceedings" and "[p]ost-investigation") (emphasis omitted). This is particularly true with respect to warrants for electronic communications, which are served on providers and regularly remain sealed while the investigation is pending. *See Leopold*, 2018 WL 1129660, at *15.

Extending a public right of access while an investigation remains open would also thwart, rather than enhance, the warrant process. *See Press-Enterprise II*, 478 U.S. at 8. As in the grand jury context discussed by the Supreme Court, "it takes little imagination to recognize" that an ongoing criminal investigation is the "kind[] of government operation[] that would be totally frustrated if conducted openly." *Id.* at 8-9. As discussed above, disclosure of warrant documents

could compromise sources, jeopardize investigative avenues, and lead to the loss of evidence. *See Fair Finance*, 692 F.3d at 432; *Times Mirror*, *Co.*, *v. United States*, 873 F.2d 1210, 1215 (9th Cir. 1989).

b.   As explained, the Special Counsel's investigation is ongoing.   The investigation involves interconnected areas of inquiry, and the government continues to investigate key questions within the scope of the Special Counsel's authority.   Disclosure of the warrant materials threatens the harms that courts have catalogued in holding that the First Amendment provides no right of access to search warrant materials in ongoing investigations.

The Special Counsel's investigation has not concluded simply because it has resulted in several indictments, and several defendants have pleaded guilty to criminal informations.   A complex investigation is not necessarily over when some defendants have been charged.   As an initial matter, here, only one case has gone to final judgment, while the remaining cases are awaiting sentencing or trial.   Further investigation continues to be a logical part of the criminal process.

Nor would it make sense to recognize a right of access automatically once any indictment has been returned, or any conviction entered.   In complex investigations, such as this one, where a single warrant may have relevance to interconnected lines of investigation, that test would fail to take into account tangible investigative harms from disclosure.   An indictment does not end an overall investigation, for example, when a defendant is potentially involved in activities with other subjects or targets, and the warrant in question seeks evidence bearing on that joint activity, but the defendant has been charged only with a subset of his conduct under investigation. The probability of a continuing investigation post-indictment grows exponentially when the search targets are linked to other persons of interest by ties to a single organization, common associates,

or coordinated activities.  Here, the government's warrant applications and related materials, including those that relate to persons who have been charged or pleaded guilty, are part of the Special Counsel's ongoing investigation.  Disclosure of those materials could reveal sources, methods, factual and legal theories, and lines of investigation extending beyond the charged conduct.

### C.  Even A Qualified First Amendment Right Would Not Justify Disclosure Here

Where a First Amendment right of access exists, it is qualified and may be limited "for cause shown that outweighs the value of openness." *Press-Enterprise I*, 464 U.S. at 509.  The government may overcome the presumptive public access if (1) "a compelling interest" exists; (2) disclosure would create "a substantial probability" of harm to that interest; and (3) alternatives would not "adequately protect the compelling interest." *Brice*, 649 F.3d at 796.

A "compelling government interest"—namely, safeguarding "the on-going investigation" —would overcome any right of access to the warrant materials being sought.  *See In re Search Warrant for Secretarial Area Outside Office of Thomas Gunn*, 855 F.2d 569, 574 (8th Cir. 1988) (*Gunn*); *see also Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (harm to ongoing investigation justifies sealing plea agreement).  "[A] compelling governmental interest exists in protecting the integrity of an ongoing law enforcement investigation." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 579 (4th Cir. 2004).  Where granting access will "disclose facts that are otherwise unknown to the public," the potential harm to the investigation is apparent.  *Id.*

The warrant materials sought by the movants could reveal "the nature, scope and direction of the government's investigation." *See Gunn*, 855 F.2d at 574.  They describe investigative sources and methods, show physical locations and electronic facilities that the government has

discovered (and, by implication, not discovered), identify potential subjects of the investigation, and reveal preliminary factual and legal theories.  The dates and volume of warrants also reveal the evolution and direction of investigative interests.  Making this information public while an investigation is ongoing could pose a clear and ominous threat to the investigation's integrity.[6]

The calculus does not change with respect to warrant materials produced to Manafort under protective order (and that have not resulted in litigation), or for warrant materials that contain investigative information that may overlap with reports that have appeared in the media.  Mem. 15. *See* Protective Order Governing Discovery, Doc. 46, *United States v. Manafort*, No. 17-cr-201-ABJ (D.D.C. Nov. 15, 2017).[7]  Producing materials publicly poses different and more substantial risks to the investigation than producing them under protective order (provided that the protective order is effective).  Similarly, press reports, which may be inaccurate or incomplete, do not erase the risks from disclosing search warrant materials.  The warrant materials reflect details about the investigation not in the public domain.  Media reports may be based on unofficial sources, half-understood facts, or speculation.

Finally, redaction is not a feasible alternative in the context of this investigation.  Movants suggest (Mem. 15-16) that if "the Warrant Materials contain specific pieces of information that the government can show would compromise a specific aspect of the Russia Investigation," infringe on grand jury secrecy, or infringe on "privacy considerations," those "specific pieces of

---

[6] The interest in protecting uncharged individuals from unjustified reputational harm also weighs against any right of access to search warrant materials.  *See Matter of Washington Post*, 201 F. Supp. 3d at 122-127.

[7] The government has also produced certain materials to Flynn and his counsel pursuant to a protective order.  *See* Order, Doc. 20, *United States v. Flynn*, No. 17-cr-232-EGS (D.D.C. Feb 16. 2018); Protective Order Governing Discovery, Doc. 22 (Feb. 21, 2018).  Discussions over a protective order are in progress with respect to Concord Management and Consulting LLC in *United States v. Internet Research Agency et al.*, No. 18-cr-32-DLF (D.D.C.).

information can and should be redacted." Because the warrant materials are replete with sensitive investigatory information, little information of public interest would remain. *See Gunn*, 855 F.2d at 574 (redactions "not practicable" where much of the documents reference sources, methods, third parties, or "scope and direction" of the ongoing investigation). Indeed, the number, nature, and targets of searches would reveal significant facts that could not be easily protected through redactions. And given the "degree of media scrutiny," too great a risk would exist that the public would be able to decipher redactions or that unredacted material would nonetheless invite damaging conjecture and speculation. *See Matter of Washington Post*, 201 F. Supp. 3d at 128. The burdensome task of undertaking warrant-by-warrant redactions is not a feasible alternative when it would create a significant probability of failure to protect the investigation and produce so little public gain.

## II.    The Common Law Right Of Access Does Not Support Public Disclosure Of Search Warrant Materials Relating To A Pending Investigation

In addition to the qualified First Amendment right of access, a "broader, but weaker, common law right" of access applies to public records, including certain "judicial records." *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997). "It is uncontested, however, that the right to inspect and copy judicial records is not absolute." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). A finding that records should be accessible pursuant to the common law right of access "involves a two-step inquiry." *Washington Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996). First, a record must qualify as a "public record" to which the right can attach. *Id.* Second, if the common law right applies, courts must then "balance the government's interest in keeping the document secret against the public's interest in disclosure." *Id.* (internal quotation marks omitted). Here, balancing the relevant factors, the common law does not provide a right of access to the search warrant materials.

16

## A.        Any Common Law Right Of Access Is Outweighed By Potential Harms

It is doubtful that any common law right of access attaches to warrant materials for open investigations.  *See Business of Custer*, 658 F.3d at 1192-1193 (no common law right attaches to "warrant materials in the midst of a pre-indictment investigation") (internal quotation marks omitted); *Times Mirror,* 873 F.2d at 1219 (the "public need" or "ends of justice" basis for disclosure "cannot be satisfied while a pre-indictment investigation is ongoing"); *cf. Matter of Washington Post*, 201 F. Supp. 3d at 129 & n.10 (holding that "at least where an investigation has concluded, a common law right of public access generally attaches to such materials" but reserving "whether a common law right of access attaches to warrant materials in *ongoing* criminal investigations"); *but see United States v. Sealed Search Warrants*, 868 F.3d 385, 395-396 (5th Cir. 2017) (extending "case-by-case approach" to qualified common law right of access to requests for access to pre-indictment warrant materials).  As explained above in the First Amendment context, open investigatory matters are generally shielded from public access for sound reasons.  The common law should follow the same rule.  But even assuming that a common law right attaches, it is overcome.

The common law "presumption" of public access "may be outweighed" by "competing interests."  *Metlife, Inc. v. Financial Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017).  The balancing of interests turns on "the relevant facts and circumstances of the particular case."  *Warner Commc'ns*, 435 U.S. at 599.  The D.C. Circuit has identified six "generalized" factors to consider:  (1) "the need for public access"; (2) the "extent of previous public access"; (3) whether "someone has objected to disclosure, and the identity of that person"; (4) "the strength of any property and privacy interests asserted"; (5) "the possibility of prejudice"; and (6) "the purposes for which the documents were introduced during the judicial proceedings." *Metlife*, 865 F.3d at 665; *see United States v. Hubbard*, 650 F.2d 293, 317-322 (D.C. Cir. 1980).  Courts must

also consider any other particularized interests that may be applicable. *Hubbard*, 650 F.2d at 323-324; *Leopold*, 2018 WL 1129660, at *12, *23-*28 (considering the burden of providing access). A court's ultimate task is to "consider[] the relevant facts and circumstances" and determine what "justice . . . requires" *Metlife, Inc.*, 865 F.3d at 665-666, articulating its reasons for resolution of the unsealing request, *Sealed Search Warrants*, 868 F.3d at 397.

The relevant factors weigh heavily against public access at this time. As to the first factor, the government does not dispute that the public is interested in understanding the Special Counsel's investigation. But as to the second, the public has not previously had access to warrant materials because courts have granted sealing orders to protect the investigation's integrity. The confidentiality of the investigation has thus not been eroded by prior judicial disclosure.[8] As to the third factor, the government objects to public access at this stage. Others may object as well. *See, e.g.*, Manafort's Mem. in Support of Motion to Seal, Doc. 57 at 2, *United States v. Manafort*, No. 18-cr-83-TSE (E.D. Va. May 11, 2018) (seeking heavy public redactions of exhibits to motion to suppress given the "overriding interest in protecting Mr. Manafort's privacy" including "prejudicial allegations that are unrelated to the issues in the suppression motions"). As to the fourth factor, reputational interests, such as shielding third parties from unjustified association with criminal conduct, weigh against disclosure. *See Matter of Washington Post*, 201 F. Supp. at 122-127; *cf.* U.S. Attorney's Manual § 1-7.400(B) (stating Department of Justice policy against commenting on an ongoing investigation "before charges are publicly filed"). And most importantly, on factor five, for the reasons already discussed, the substantial risk of prejudice to

---

[8] As movants note (Mem. 7-8), government filings have referred to a handful of warrants. Even then, however, the filings have protected information, such as what electronic facilities were searched. And, where necessary, the government has obtained highly limited unsealing orders for certain warrants, while leaving the substance under seal. *See In the Matter of the Search of Email Accounts*, No 17-mj-686 (D.D.C. Dec. 21, 2017).

the government's ongoing investigation militates strongly against access.  *See, e.g.*, *Sealed Search Warrants*, 868 F.3d at 395 ("If the unsealing of pre-indictment warrant materials would threaten an ongoing investigation, the district court has discretion . . . to leave the materials under seal"); *Pirk*, 282 F. Supp. 3d at 602.  Revealing warrant materials could "tip off" subjects to "investigative methods and techniques" and "enable" them "to evade detection" or destroy evidence.  *Leopold*, 2018 WL 1129660, at *31.  It could also provide a roadmap to the facts obtained and preliminary legal theories.

### B.   Redactions Are Not A Viable Alternative

Redactions would not practically address these concerns.  As discussed, the warrant materials reflect significant details about the investigation, including facilities searched, theories of crimes, predicating evidence, and descriptions of sources.  Segregation of that information would not be feasible.  *See Pirk*, 282 F. Supp. 3d at 602 (redaction not feasible to address common law presumption where confidential information "encompasses a large portion of the affidavit" and redaction "would render the affidavit of little use"); *Gunn*, 855 F.2d at 574 (similar); *see also Matter of Washington Post*, 201 F. Supp. 3d at 128 (finding redactions inadequate).  Additionally, redactions would impose an unreasonable burden on the government, for little public benefit given the need to protect investigative sources, methods, leads, and facts.  *See Leopold*, 2018 WL 1129660, at *20, *23-*24 (considering "the imposition of substantial burdens" on the government and the court in rejecting of common law right of access).

### III.   The Government Does Not Oppose Release Of Certain Records From The Pending Prosecution in *United States v. Manafort* With Appropriate Redactions

Movants have sought certain records related to the pending prosecutions in *United States v. Manafort* pending in this Court and in the Eastern District of Virginia.  Because the warrant

materials concern not just that case but also open investigations, no First Amendment rights attaches, and any common law right would be outweighed by investigative and privacy interests.

The government does not oppose, however, unsealing the two warrants that were issued and sealed in the Eastern District of Virginia and that are now the subject of suppression proceedings in both courts, provided appropriate redactions are permitted.  The government recognizes that these warrants are directly at issue in public judicial proceedings.  *Cf. Pirk*, 282 F. Supp. 3d at 600 (noting possibly different treatment "once the issues related to a search warrant evolve into a suppression hearing").  At least some investigative information—including what was searched, what was recovered, and some of the bases for the search—have been revealed in briefing.  And further non-public facts may be discussed in open court during suppression hearings. Additionally, because these are among the earliest warrants obtained in the investigation and only two warrants are at issue, the government believes that it could practicably redact sensitive information and nonetheless leave unredacted certain information whose disclosure would not harm the ongoing investigation.

Movants additionally seek (Mem. 8) to unseal an exhibit filed by Gates's former counsel when seeking to withdraw from the case, two sealed transcripts (from January 22 and February 7 hearings), and a sealed portion of a transcript from the February 14 hearing.  The government takes no position on those requests.  The government's understanding is that the exhibit and all three transcripts were sealed to protect Gates's and Manafort's interests.  The government did not participate in the substance of the February 7 hearing and portions of the February 14 hearing, which were *ex parte*, and the government does not have access to the sealed transcriptions of the *ex parte* proceedings.  Accordingly, the government takes no position on those materials.

**CONCLUSION**

For the foregoing reasons, the motion for unsealing should be denied as to the search warrant materials except for the two Manafort warrants that are the subject of motions to suppress, with appropriate redactions.   The government takes no position on the exhibit and sealed transcripts from *United States v. Manafort*, No. 17-cr-201-ABJ (D.D.C.).

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: May 23, 2018

*/s/ Michael R. Dreeben*
Michael R. Dreeben
Andrew Weissmann
Adam C. Jed
U.S. Department of Justice
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800
*Attorneys for the United States of America*

**APPENDIX A**

**Criminal Charges Brought By The Special Counsel's Office As Of May 23, 2018**

- On October 5, 2017, George Papadopoulos, who "served as a foreign policy advisor" to the Trump campaign, pleaded guilty to making false statements to the FBI, in violation of 18 U.S.C. § 1001, "about the timing, extent, and nature of his relationships and interactions with certain foreign nationals whom he understood to have close connections with Senior Russian government officials." *See* Information, Doc. 8, *United States v. Papadopoulos*, No. 17-cr-182-RDM (D.D.C. Oct. 3, 2017); Statement of the Offense, Doc. 19 (Oct. 5, 2017). Papadopoulos has not been sentenced.

- On October 27, 2017, a grand jury in this District returned a 12-count indictment alleging that Paul J. Manafort, Jr., and Richard W. Gates III committed various crimes in connection with work they performed for Russia-backed political entities in Ukraine. Indictment, Doc. 1, *United States v. Manafort*, No. 17-cr-201-ABJ (Oct. 27, 2017). On February 22, 2018, a grand jury in the Eastern District of Virginia returned a 32-count indictment alleging that Manafort and Gates committed various crimes in connection with the payments they received for work that they performed for Russia-backed political entities in Ukraine. Superseding Indictment, Doc. 9, *United States v. Manafort*, No. 18-cr-83-TSE (Feb. 22, 2018). (On February 13, 2018, a grand jury in the Eastern District of Virginia had returned an indictment against Manafort. Doc. 1.) On February 23, 2018, a D.C. grand jury returned a five-count superseding indictment, which no longer charged Gates or included certain counts. Superseding Indictment, Doc. 202, No. 17-cr-201-1-ABJ (Feb. 23, 2018). Manafort has trials scheduled in the Eastern District of Virginia on July 10, 2018, and in this District on September 17, 2018.

- On February 23, 2018, Gates pleaded guilty in this District to a multi-object conspiracy, in violation of 18 U.S.C. § 371, and to making false statements, in violation of 18 U.S.C. § 1001. *See* Superseding Criminal Information, Doc. 195, *United States v. Gates*, No. 17-cr-201-2-ABJ (Feb. 23, 2018); Statement of the Offense, Doc. 206 (Feb. 28, 2018). Gates has not been sentenced.

- On December 1, 2017, Lieutenant General Michael T. Flynn (Ret.), who "served as a surrogate and national security advisor" for the Trump campaign and as the National Security Advisor to President Trump, pleaded guilty to making false statements to the FBI, in violation of 18 U.S.C. § 1001, about communications with the Russian ambassador concerning a pending United Nations Security Council resolution and about U.S. sanctions against Russia and Russia's response to those sanctions. *See* Information, Doc. 1, *United States v. Flynn*, No. 17-cr-232-EGS (D.D.C. Nov. 30, 2017); Statement of the Offense, Doc. 4 (Dec. 1, 2017). Flynn has not been sentenced.

- On February 12, 2018, Richard Pinedo pleaded guilty to identity fraud, in violation of 18 U.S.C. § 1028, for having obtained bank account numbers, many created with stolen identities, to circumvent the security features of an online payment processor. *See*

Information, Doc. 1, *United States v. Pinedo*, No. 18-cr-24-DLF (D.D.C. Feb. 7, 2018); Statement of the Offense, Doc. 13 (Feb. 12, 2018).  Pinedo has not been sentenced.

- On February 16, 2018, a grand jury returned an indictment against 13 Russian nationals and three Russian entities accused of violating U.S. criminal laws in order to interfere with U.S. elections and political processes.  The indictment charges all of the defendants with conspiracy to defraud the United States in violation of 18 U.S.C. § 371, three defendants with conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 371, and five defendants with aggravated identity theft in violation of 18 U.S.C. § 1028A. Indictment, Doc. 1, *United States v. Internet Research Agency, et al.*, No. 18-cr-32-DLF (D.D.C. Feb. 16, 2018).  A trial has not been scheduled.

- On February 20, 2018, Alex van der Zwaan pleaded guilty to making false statements to the FBI, in violation of 18 U.S.C. § 1001, about communications with Gates and another person, and about destruction and concealment of evidence from the Special Counsel's Office, all related to connections between Gates, Manafort, and their work in Ukraine.  *See* Information, Doc. 1, *United States v. van der Zwaan*, No. 18-cr-31-ABJ (D.D.C. Feb. 16, 2018); Statement of the Offense, Doc.  9 (Feb. 20, 2018).  This Court sentenced van der Zwaan on April 3, 2018.