AO 106 (Rev. 04/10)  Application for a Search Warrant

FILED

# UNITED STATES DISTRICT COURT

for the

District of Columbia

AUG 1 7 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH THE EMAIL
ACCOUNTS rgates@dmpint.com AND
kkilimnik@dmpint.com  THAT IS STORED AT PREMISES
CONTROLLED BY RACKSPACE US, INC.

)
)
)
)
)

Case: 1:17-mj-00612
Assigned To : Howell, Beryl A.
Assign. Date : 8/17/2017
Description: Search and Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Western _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. 371 | Conspiracy | |
| 18 U.S.C. 1001 | False Statements | |
| et al. | See attached Affidavit | |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet

Reviewed by AUSA/SAUSA:

███████████████

*Applicant's signature*

Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 17, 2017

*Judge's signature*

City and state:  Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge

*Printed name and title*

FILED

AUG 1 7 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
EMAIL ACCOUNTS rgates@dmpint.com
AND kkilimnik@dmpint.com  THAT ARE
STORED AT PREMISES CONTROLLED
BY RACKSPACE US, INC.

Case: 1:17-mj-00612
Assigned To : Howell, Beryl A.
Assign. Date : 8/17/2017
Description: Search and Seizure Warrant

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, ███████████, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

### A. Affiant

1.   I am a Special Agent with Federal Bureau of Investigation ("FBI") working directly with the Special Counsel's Office.  I have been a Special Agent with the FBI since 2015.  I have training and experience related to foreign intelligence services and national security investigations, as well as federal financial crimes.  Prior to my employment with the FBI, I spent seven years in the software industry and have extensive experience working with computer technology.

2.    This affidavit is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement personnel, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents or the statements and conversations of others are reported herein, they are reported in substance and in pertinent part, except where otherwise indicated.

## B.  The Subject Accounts

3.     I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703, for information and all content associated with (1) the email address rgates@dmpint.com (the "Gates Account"), and (2) the email address kkilimnik@dmpint.com (the "Kilimnik Account"), stored at premises owned, maintained, controlled, or operated by Rackspace US, Inc. (hereinafter, "Rackspace"), an email provider headquartered at 1 Fanatical Place, City of Windcrest, San Antonio, TX 78218 (collectively, the "Subject Accounts").  The information to be searched is described in the following paragraphs and in Attachment A.  Upon receipt of the information described in Attachment A, government-authorized persons will review that information to locate the items described in Attachment B.

4.     The Gates Account is believed to be controlled by Richard W. Gates III, also known as Rick Gates, in connection with his employment at DMP International, LLC. ("DMP").  Gates is a United States citizen.  In addition to his work at DMP and affiliated entities, he played a role in the campaign of Donald J. Trump for President, Inc., (the "Trump Campaign") and worked on the inauguration.

5.     DMP was a lobbying and political consulting firm, and was owned and controlled by Paul J. Manafort, Jr., a United States citizen.  As further described below, in March 2016, Manafort officially joined the Trump Campaign.

6.     The Kilimnik Account is believed to be controlled by Konstantin Kilimnik in connection with his work at DMP.  In an interview with the FBI in 2014, Gates identified the principals of DMP as Manafort, himself, and Konstantin Kilimnik, and he indicated that Kilimnik was a Russian citizen who lived in Ukraine and worked on the day-to-day operations of DMP.  Gates indicated that Kilimnik had worked for Manafort-related entities since before 2006.

## C.  The Subject Offenses

7.     For the reasons detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of:  31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206 (filing a false tax return); 18 U.S.C. § 1001 (false statement); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy); and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses").

## D.  The Provider

8.     I have learned the following about the Provider:

a.   The Provider offers email services to the public.  In particular, the Provider allows a subscriber to maintain email accounts under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "xyzbusiness.com," the Provider enables the subscriber to host any email address under this domain name (*e.g.*, john@xyzbusiness.com) on servers operated by the Provider.  A subscriber using the Provider's services can access his or her email account from any computer connected to Internet.

b.   The Provider generally maintains the following records and information with respect to every subscriber account:

i.   *Email contents.*  In general, email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Provider's computers

indefinitely.   Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

      ii.   ***Address Book.***   The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of email users.

      iii.   ***Subscriber and billing information.***   The Provider collects and maintains (typically unverified) identifying information about each subscriber, including for example, name, username, address, telephone number, and alternative email addresses.   The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.,* active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number.  In circumstances where the Provider's services are accessed through a reseller, the subscriber and billing information may be that of the reseller instead of the ultimate subscriber, but such information regarding the ultimate subscriber may be present in the content of the email account.

      iv.   ***Transactional information.***  The Provider also typically retains certain transactional information about the use of each account on its system.  This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

      v.   ***Preserved and backup records.***   The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).   The

4

Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy. A preservation request was sent to Rackspace for the Gates and Kilimnik Accounts in June and August of 2017.

## JURISDICTION

9.      Pursuant to § 2703(a), (b)(1)(A), and (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *Id.* § 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

11.     When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber or any other person of the warrant, for such a period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## PROBABLE CAUSE

12.     As set forth herein, there is probable cause to believe that the Subject Offenses have been committed by Gates, Manafort, and others known and unknown and further, that evidence, contraband, fruits, and/or instrumentalities of violations of the Subject Offenses may be found in the Subject Accounts. As discussed below, Manafort and Gates, as part of their work for DMP,

served as a lobbyists and political consultants for the Party of Regions, a Ukrainian political party commonly believed to be aligned with Russia. That work included activities in the United States. There is probable cause to believe that Manafort, Gates, and others engaged in a scheme to hide connections to the Party of Regions and to hide income paid on behalf of Ukrainian politicians and others, through foreign bank accounts in Cyprus and elsewhere, to and on behalf of Gates and Manafort and related people and companies.

## A. Manafort and Gates Work for Ukraine

13. As noted above, [redacted] Gates have been employed for many years through DMP and related entities as lobbyists and political consultants working both in the United States and internationally. Beginning in or about 2006 and at least until 2014, Manafort provided political and policy services to the Ukrainian Party of Regions, including Viktor Yanukovych, head of the Party of Regions and the President of Ukraine from 2010 to 2014. Gates told the FBI in an interview in July 2014 ("the Gates Interview") that he was hired by Manafort in 2006 and worked on Ukrainian election and policy advice, up to the time of the interview. Gates advised that in 2010, he and Manafort were in Ukraine for over two months leading up to the election that brought Yanukovych to power.

14. As part of their work on behalf of the Party of Regions, Gates, Manafort, and DMP engaged two U.S. lobbying and political consulting firms: [redacted] and [redacted]. As described below, emails previously produced to the Department of Justice, including emails involving the Subject Accounts, evidence work by

6

DMP, through Gates and Manafort, on behalf of the Party of Regions in the United States, together with individuals associated with both the ████████████████

15.     A search of the United States Department of Justice database of all agents currently or previously registered under FARA, conducted in July 2017, also discloses that Manafort, Gates, and their affiliated entities, including DMP, failed to register as agents of a foreign government until June 27, 2017.[1]  As long-time lobbyists, Manafort and Gates would know about the FARA requirements.  Indeed, as set forth in greater detail below, in email communications between Gates (using the Gates Account) and the ████████████ concerning joint Ukraine work, Gates demonstrated that he was clearly aware in 2012 of FARA filing rules.

### 1.  Payments from Cypriot Accounts to and for Manafort

16.     From in or about at least 2008 to at least 2014, payments from bank accounts in Cyprus  – nominally owned by foreign companies – were used to make payments to (a) United States corporate and personal bank accounts controlled by Manafort or Gates and (b) United States vendors for services provided to Manafort or Gates.  During this time period, tens of millions of dollars from these foreign accounts were paid directly[2] and indirectly to Manafort, Gates, and Manafort-related entities.

| Company | Bank Name | Account # | Transaction Example |
|---------|-----------|-----------|---------------------|
| Telmar Investments Limited | Bank of Cyprus PCL Ltd | ████████████ | On or about June 27, 2014, $250,000 was sent to an account in the name of DMP International, LLC at HSBC Bank. |

---

[1] The database is publicly available at https://www.fara.gov/.

[2] The term "directly" is used to differentiate the "indirect" payments made to vendors that provided services to Manafort.  Wires from Cypriot accounts that were sent to various Manafort entities such as DMP would at various times be passed through more than one United States account affiliated with Manafort before being used to pay for business expenses as well as other items.

| Company | Bank Name | Account # | Transaction Example |
|---|---|---|---|
| Yiakora Ventures Limited | Bank of Cyprus PCL Ltd | | On or about September 2, 2010, $1 million was sent to an account in the name of Global Sites LLC at Wachovia Bank. On or about June 4, 2008, $8 million was sent to an account in the name of Jesand Investment Corporation at First Republic Bank. |
| Lucicle Consultants Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about November 9, 2012, $300,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |
| Actinet Trading Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about August 1, 2012, $70,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |
| Black Sea View Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about December 21, 2011, $1 million was sent to an account in the name of Paul J Manafort and Kathleen B Manafort at First Republic Bank. |
| Bletilla Ventures Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about April 10, 2012, $900,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |
| Evo Holdings Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about January 30, 2009, $70,000 was sent to an account in the name of Davis Manafort Partners, Inc. at Wachovia Bank. |
| Global Highway Limited | Cyprus Popular Bank (Previously Marfin | | On or about December 23, 2009, $500,000 was sent to an account in the name of Davis Manafort |

| Company | Bank Name | Account # | Transaction Example |
|---|---|---|---|
| | Popular Bank) | | Partners, Inc. at Wachovia Bank. |
| Leviathan Advisors Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about May 27, 2011, $258,000 was sent to an account in the name of Davis Marfin Partners, Inc. at First Republic Bank. |
| Loav Advisors Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about October 7, 2010, $120,000 was sent to an account in the name of Paul J Manafort and Kathleen B Manafort at Wachovia Bank. |
| Lucicle Consultants Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about June 27, 2012, $650,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |
| Peranova Holdings Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about February 1, 2012, $1.5 million was sent to an account in the name of DMP International, LLC at First Republic Bank. |
| Telmar Investments Limited | Eurobank Cyprus Ltd | | On or about January 16, 2014, $500,000 was sent to an account in the name of DMP International, LLC at HSBC Bank. |
| Actinet Trading Limited | Hellenic Bank PCL Ltd | | On or about April 8, 2013, $200,000 was sent to an account in the name of DMP International, LLC at HSBC Bank. |
| Bletilla Ventures Limited | Hellenic Bank PCL Ltd | | On or about March 1, 2013, $300,000 was sent to an account in the name of Symthson LLC at JPMorganChase Bank. |
| Lucicle Consultants Limited | Hellenic Bank PCL Ltd | | On or about February 15, 2013, $500,000 was sent to an account in the name |

| Company | Bank Name | Account # | Transaction Example |
|---------|-----------|-----------|---------------------|
|         |           |           | of Symthson LLC at JPMorganChase Bank. |

17.     The FBI has obtained bank records that evidence that Manafort controlled and/or held executive positions at the following United States entities, which received tens of millions of dollars from the above-listed financial accounts in Cyprus between at least 2008 to at least 2014:

(1) Davis Manafort Partners, Inc.;

(2) DMP International, LLC;

(3) Global Sites LLC; and

(4) Jesand Investment Corporation.[3]

Bank records also reflect that Gates held signature authority over the account in the name of Symthson LLC.[4] Correspondent bank records further show that between approximately 2008 and 2013, he separately received more than a million dollars from the Cypriot accounts in accounts held in his name, including at least one foreign account.

18.     In addition, bank records evidence that millions of dollars were wired directly from the Cypriot accounts to pay vendors for goods and services provided to and for Manafort. For instance, funds from these foreign accounts were used to rent a villa in Italy at which the Manaforts vacationed (over $49,000); to pay for rugs from an Alexandria store called J & J Oriental Rugs

---

[3] Jesand Investment Corporation was incorporated in Virginia in 2002 and dissolved in 2013. It lists its addresses as Manafort's addresses in Alexandria, Virginia and Palm Beach Gardens, Florida. Per "CS 1," a long-term employee of various Manafort-related entities, the name "Jesand" is an amalgam of Manafort's ███████████████████████████████████████████

[4] Smythson LLC was incorporated in Delaware in 2008. Note that bank accounts for this company were opened under the name "Symthson," using addresses listed for Manafort in other of his companies.

(over \$360,000); to pay for landscaping services for the Manaforts (over \$395,000); and to pay two separate clothiers (Alan Couture and House of Bijan) for clothing purchased by Manafort (over \$400,000 and \$360,000 respectively). The records for one of the clothiers – Alan Couture – evidence that Manafort was aware of and controlled these foreign wire payments, as he noted to the vendor in two spring 2011 emails that the vendor would be paid shortly from the Leviathan Holdings Cypriot account, noted above.

19.      Gates have both told the FBI in interviews in 2014 that they were paid for their work for the Ukrainian Party of Regions through Cypriot bank accounts.



In the Gates Interview, Gates admitted he was directed to open accounts in Cyprus by President Yanukovych's Chief of Staff Boris Kolesnikov. He was told it was easier for them to be paid from one Cyprus account to another Cyprus account. Gates said that various oligarchs would chip in to pay them for their consulting work. Gates identified Lucicle, Bletilla, Leviathan, and Global Endeavor (among others) as accounts opened to receive such payments.

20.      In addition, in 2014 Manafort wrote to the First Republic Bank, a United States financial institution, to object to the bank's determination to close all the Manafort-related accounts based on its anti-money laundering policies and concerns about incoming international wires. In his correspondence to the bank, Manafort admitted he was paid by Ukraine but he claimed that the money he received from Ukraine was for "very public consulting services" from "legitimate activities that were totally legal." Manafort also wrote the bank that he had "[n]o

interaction with oligarchs for business."



A court-authorized search in May 2017 of a storage locker in Virginia used by Manafort revealed █████████████ Finally, in the Gates Interview, Gates admitted that Manafort met with another oligarch, Dmitry Firtash, to discuss a New York real estate transaction they would undertake together and to pitch other ideas. ████████████

### 2.  Manafort and Gates Tax Returns

21.    There is probable cause to believe that Manafort failed to properly disclose to the United States government his relationship to the Ukrainian Party of Regions and the income he received (directly or indirectly) as a result of his work for that party.  Further there is evidence of Gates' involvement in these offenses.  For example, and as discussed below, Gates was in contact with Manafort's and DMP's accountants relating to the company's and Manafort's taxes.

---

[5] John Hannah, LLC was located at the same address as DMP – ███████████ and received mail there.  The company also received mail at the Manafort home in Florida. ████

22.     Further, there is probable cause to believe that both Gates and Manafort failed to properly disclose the existence of foreign accounts in which they held a financial interest.  Pursuant to a tax order from the Eastern District of Virginia (Buchanan, J.) dated April 14, 2017, the FBI has obtained and reviewed, among others, the tax returns for Manafort and Gates for 2009-2014. In all of the tax returns, Manafort and Gates submitted a Schedule B form, which required them to declare whether they have "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account." Each year, Manafort and Gates declared "No."  That same form also contained a cross-reference to the requirement to file a Report of Foreign Bank and Financial Accounts (FBAR) to report overseas financial interests or signature authority.   An FBAR filing is required, on a yearly basis, if a United States person has a financial interest in or signatory authority over at least one financial account located outside the United States and at least $10,000 in aggregate value in foreign accounts at any time during the calendar year.  As discussed above, there is probable cause to believe that Manafort and Gates had a financial interest, in excess of $10,000, in various accounts in Cyprus in at least 2008-2014.  A review of data from the Financial Crimes Enforcement Network (commonly known as FinCEN) shows that Manafort and Gates have not filed an FBAR for at least the years 2008 to the present.

23.     In addition, the foreign source income listed in the tax returns for Manafort does not appear to account for the above distributions to or from the Cypriot accounts on his behalf. For instance, the 2009 Manafort tax return indicates $17,736 in gross foreign source income; in 2010, $42,789; in 2011, $165,871; in 2012, $129,777; in 2013, $38,375; and in 2014, $39,468.

24.     The bank records, however, reveal the following:

- In 2008, the Cypriot accounts transferred at least $3,500,000 to accounts in the joint names of Paul and Kathleen Manafort, and transferred at least $9,000,000 to accounts of United States entities affiliated with Manafort.

- In 2009, the Cypriot accounts transferred at least $1,500,000 to accounts in the joint names of Paul and Kathleen Manafort, transferred at least $35,000 to accounts in the names of Manafort's relatives, transferred at least $3,000,000 to accounts of United States entities affiliated with Manafort, and transferred at least $200,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2010, the Cypriot accounts transferred at least $2,000,000 to accounts in the joint names of Paul and Kathleen Manafort, transferred at least $80,000 to accounts in the names of Manafort's relatives, transferred at least $6,000,000 to United States entities affiliated with Manafort, and transferred at least $600,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2011, the Cypriot accounts transferred at least $1,800,000 to an account in the joint names of Paul and Kathleen Manafort, transferred at least $30,000 to an account in the name of a Manafort relative, transferred at least $3,000,000 to an account of a United States entity affiliated with Manafort, and transferred at least $500,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2012, the Cypriot accounts transferred at least $200,000 to an account in the joint names of Paul and Kathleen Manafort, transferred at least $8,500,000 to accounts of United States entities affiliated with Manafort, and transferred at least $1,000,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2013, the Cypriot accounts transferred at least $2,500,000 to accounts of United States entities affiliated with Manafort and transferred at least $1,000,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2014, the Cypriot accounts transferred at least $5,000,000 to accounts of United States entities affiliated with Manafort.

25.    There appears to be no legitimate business reason for these transactions, which appear to pass funds from a Ukrainian political party through more than one Cypriot bank account; have payments made directly to United States vendors from the Cypriot accounts; and pass money brought onshore from Cyprus through multiple United States accounts. Based on my training and experience, these transactions evidence in my view the crimes of tax evasion and money laundering to conceal the origins of the funds paid to Manafort and Gates.

## B.  Use of the Subject Accounts

### 1.    The Gates Account

26.    There is probable cause to believe that the Gates Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, including emails that Gates sent and received concerning work performed on behalf the Ukraine Party of Regions, as well as correspondence relevant to various tax offenses. This assessment is based on a variety of emails, including those sent and received by the Gates Account submitted to the Department of Justice's FARA Unit by the

28.    In April 2012, there were a series of emails, produced by the ▮▮▮▮▮▮▮, in which ▮▮▮▮▮▮ (a lawyer from ▮▮▮▮▮▮), and Gates (using the Gates Account) discussed the engagement by the European Centre For a Modern Ukraine (ECFMU) and the need to file FARA forms. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ With respect to the "Centre," an apparent reference to the ECFMU, ▮▮▮▮ noted:





In forwarding the message to ▮▮▮▮ and ▮▮▮▮, Gates noted, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ In its June 2017 FARA filing, DMP disclosed a "10/30/12 Email to Ambassador

▮▮▮▮▮ regarding U.S. statement on Ukrainian elections" as political activity performed on

behalf of the Party of Regions.



34.    Additionally, there were '

35.    Gates also used the Gates Account to communicate with the accountants who prepared the tax returns for Manafort, DMP, and various other Manafort entities. For example, on or about December 16, 2011, an accountant at Kositzka, Wicks and Company ("KWC") who represented Manafort and DMP on tax matters emailed Gates at the Gates Account, copying another KWC accountant, with the subject, "Summary of 12.15.11 conference call." The email included an outline of issues related to the personal finances of Manafort, as well as the finances of DMP and other Manafort-related entities, including references to a "Ukraine Presidential Advisor fee," a contract with a Russian NGO, and a purported loan to Yiakora – one of the Cypriot account holders discussed above.

36.    On January 4, 2012, the same KWC accountant emailed Gates at the Gates Account, copying another KWC accountant, with the subject "Summary of 12.21.11 tax planning meeting." The text of the email contained a summary of various financial information related to DMP,

18

Manafort, and his other entities. The accountant indicated that once Gates "approve[d] the summary, we will forward it to Paul for his review."

37.     On September 5, 2013, the same KWC accountant emailed Rick Gates at the Gates Account, copying others at KWC, and asked a serious of questions relating to various business issues at DMP, Manafort's personal expenses, and professional services including Foreign Meals and Entertainment and net income.

38.     On September 16, 2013, Gates, using the Gates Account, emailed accountants at KWC who represent Manafort and DMP on tax matters. The subject of the email was "DMP," and under attachments, the following appears: "2012 E-File Forms – DMP International, LLC-signed.pdf". In the body of the email, Gates writes "Please confirm you have this received. I believe this is the last return. Thanks, Rick."



**2.   The          Account**

40.     There is also probable cause that evidence, fruits, and/or instrumentalities of the Subject Offenses will be found on the ▮▮▮▮ Account, including evidence related to work by DMP on behalf of the Party of Regions. As noted above, Gates told the FBI in a 2014 interview that Kilimnik worked for Manafort-related entities since before 2006 and worked on the day-to-day operations of DMP in Ukraine.

41.     Documents obtained from ▮▮▮▮▮▮ show that the ▮▮▮▮ Account was copied on a number of emails related to work by Manafort, Gates, ▮▮▮▮▮, and ▮▮▮, purportedly on behalf of the ECFMU. For example, on or about ▮▮▮▮▮▮▮▮▮▮



of

Based on open sources, I know that Mykola Azarov was the Prime Minister of Ukraine at the time, as well as a leader in the Party of Regions.

43.    On or about ▮▮▮▮▮▮ was copied, among other accounts, on an email from ▮▮▮▮ of ECFMU, ▮▮▮▮▮▮



45.    The ▮▮▮▮▮▮ is also likely to have records related to payments from the Party of Regions to DMP relevant to the Subject Offenses.  In 2014, Gates told the FBI that

Kilimnik's job was to interact with party members, *i.e.*, members of the Party of Regions. Manafort also told the FBI in 2014 that Kilimnik and Gates were in charge of collecting and tracking all monies coming in for Manafort's services. Further, there is evidence that used to communicate directly with Manafort and Gates about the business of DMP and its work on behalf of Ukraine. For example, documents produced by



## ADDITIONAL INFORMATION REGARDING RACKSPACE EMAIL

46.     In my training and experience, I have learned that Rackspace provides a variety of on-line services, including electronic mail ("email") access, to the public and its corporate customers. During the registration process, Rackspace asks subscribers to provide basic personal information. Therefore, the computers of Rackspace are likely to contain stored electronic communications (including retrieved and unretrieved email for Rackspace subscribers and information concerning subscribers and their use of Rackspace services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

47.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment

21

(including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

48. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

49. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the account's user or users.

50.      This application seeks a warrant to search all responsive records and information under the control of Rackspace, a provider subject to the jurisdiction of this court, regardless of where Rackspace has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Rackspace's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[6]

51.      As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may

---

[6] It is possible that Rackspace stores some portion of the information sought outside of the United States.  In *Microsoft Corp. v. United States*, 829 F.3d 197 (2d Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States.  As the Second Circuit decision is not binding on this Court, I respectfully request that this warrant apply to all responsive information—including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Rackspace.  The government also seeks the disclosure of the physical location or locations where the information is stored.

indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

*[Space intentionally left blank]*

## CONCLUSION

52.     Based on the forgoing, I request that the Court issue the proposed search warrant.

53.     Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to address potential privileges.

## REQUEST FOR SEALING

54.     In light of the confidential and highly sensitive nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.


Respectfully submitted,



Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me on this 17th day of August, 2017.


The Honorable Beryl A. Howell
Chief United States District Judge

25

## **ATTACHMENT A**

This   warrant   applies   to   information   associated   with   the   email   accounts **rgates@dmpint.com** and **kkilimnik@dmpint.com** that is stored at premises owned, maintained, controlled, or operated by Rackspace US, Inc., 1 Fanatical Place, City of Windcrest, San Antonio, TX 78218.

## ATTACHMENT B

### I.      Information to be disclosed by Rackspace

To the extent that the information described in Attachment A is within the possession, custody, or control of the Rackspace US, Inc. (hereinafter "the Provider"), regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that have been deleted but are still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 8, 2017, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    a.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

    b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    The types of service utilized;

    d.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

    e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, all other user names associated with the account, all account names associated with the subscriber, methods of connecting;

f.      All search history or web history;

g.      All records indicating the services available to subscribers of the accounts;

h.      All usernames associated with or sharing a login IP address or browser cookie with the accounts;

i.      All cookies, including third-party cookies, associated with the user;

j.      All records that are associated with the machine cookies associated with the user; and

k.      All telephone or instrument numbers associated with the Account (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

## II.    Information to be Seized by the Government

Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206 (filing a false tax return); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy); 18 U.S.C. § 1001 (false statement) and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses"), occurring on or after January 1, 2006, including but not limited to:

a.      Evidence relevant to the locations and movements of, and communications between, Manafort, Gates, or employees, agents, or clients of the same or their companies;

b.      Communications, records, documents, and other files involving Davis Manafort Partners, Jesand Corporation, Global Sites Inc., Smythson LLC, John Hannah Inc., and/or DMP International, LLC;

c.      Communications between Manafort, Gates, and ███████

d.      Any and all financial records for Paul Manafort Jr., Richard W. Gates III, and associated business entities, including but not limited to records relating to foreign financial accounts and records relating to payments by or on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

e.  Evidence relevant to any false statements, pretenses, representations, or material omissions in connection with communications with the Department of Justice, the Internal Revenue Service, tax preparers, accountants, or banks;

f.  Records relating to efforts by Manafort, Gates, or their affiliated entities, agents, or representatives to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals, or any contacts or meetings with these parties;

g.  Evidence relevant to any money, financing, position or thing of value being offered or given to Manafort, Gates, and employees, agents, or clients of the same or their companies;

h.  Communications between, on behalf of, or concerning the ███████████ European Centre for a Modern Ukraine, or the Ukrainian Party of Regions, or their agents or representatives;

i.  Evidence establishing the motive, capability, or willingness to commit the above-referenced crimes, including but not limited to evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

j.  Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

k.  The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

l.  Evidence relevant to identifying any other locations capable of storing electronic data, financial accounts, or locations where any physical items may be stored under the control of Manafort, Gates, their companies, or any coconspirators, along with any password, account name or number, or other means of access to such accounts or locations.

se

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC<br>BUSINESS RECORDS PURSUANT TO FEDERAL RULE<br>OF EVIDENCE 902(11)</u>

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained

in this declaration is true and correct.  I am employed by Rackspace, and my official title is

_____.  I am a custodian of records for Rackspace.  I state that each

of the records attached hereto is the original record or a true duplicate of the original record in the

custody of Rackspace and that I am the custodian of the attached records consisting of _____

(pages/CDs/kilobytes). I further state that:

      a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge

of those matters;

      b.     such records were kept in the ordinary course of a regularly conducted business

activity of Microsoft; and

      c.     such records were made by Rackspace as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules

of Evidence.


_____     _____

Date                  Signature