AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture



# UNITED STATES DISTRICT COURT
### for the
District of Columbia

**FILED**

**OCT 27 2017**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In the Matter of the Seizure of
*(Briefly describe the property to be seized)*
Funds not to exceed $1,100,637 from bank account
███████████ at The Federal Savings Bank held
in the name of Paul Manafort, Jr.

)
)
)
)
)

Case: 1:17-mj-00783
Assigned To : Howell, Beryl A.
Assign. Date : 10/26/2017
Description: Seizure Warrant

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ____Northern____ District of ____Illinois____ is subject to forfeiture to the United States of America under ___18___ U.S.C. § 981, 982(a)(1) *(describe the property)*:

A sum of funds not to exceed $1,100,637 from bank ███████ ███████████ at The Federal Savings Bank held in the name of Paul Manafort, Jr.

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

███████████████████████████
*Applicant's signature*

███████████████████████████
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/27/2017

City and state: Washington, DC

_Sydd Howell_
*Judge's signature*

Chief United States District Judge
*Printed name and title*

FILED

OCT 2 7 2017

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

---

IN THE MATTER OF THE SEIZURE OF
FUNDS FROM ACCOUNTS AT THREE
BANKS

Case: 1:17-mJ-00783
Assigned To . Howell, Beryl A Assign.
Date : 10/26/2017
Description: Seizure Warrant

---

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEIZURE WARRANT

I,                        being duly sworn, hereby depose and state as follows:

### I.    Introduction

1.    I am a Special Agent with Federal Bureau of Investigation ("FBI") working directly

with the Special Counsel's Office. I have been a Special Agent with the FBI since 2015. I have

training and experience related to national security investigations, as well as federal financial

crimes. While at the FBI Academy, I completed training in conducting financial investigations,

and I am familiar with how criminal activity is often conducted through the use of layered bank

transfers and offshore accounts. During my career, I have received training in and have

participated in the execution of search warrants for documents, records, and proceeds from illegal

activities, and have participated in the subsequent investigation and analysis of evidence seized

pursuant to these warrants.

2.    This affidavit is based upon my personal knowledge, law enforcement personnel's

review of documents and other evidence, my conversations with other law enforcement personnel,

and my training and experience. Because this affidavit is being submitted for the limited purpose

of establishing probable cause, it does not include all the facts that I have learned during the course

of my investigation. Where the contents of documents or the statements and conversations of

others are reported herein, they are reported in substance and in pertinent part, except where

-1-

otherwise indicated. The dates and amounts referred to in this affidavit are approximate, and summaries of payments do not include all payments known in the investigation.

## II.   Property to Be Seized

3.     I make this affidavit in support of an application for the issuance of seizure warrants, pursuant to 21 U.S.C. § 853(f) and Rule 41 of the Federal Rules of Criminal Procedure, to seize the following assets (collectively, the Target Assets):

   a.  A sum of funds not to exceed $3,755,892.64 from bank account number ███████; at ██████████  █  ████████  ██ held in the name of ████████████ (the Target ████ Account);

   b.  A sum of funds not to exceed $271,000 from bank account number ██████████at ██████ N.A. held in the name of Kathleen Manafort (the Target ██████ ████ Account);

   c.  A sum of funds not to exceed $1,100,637 from bank account number████████ at The Federal Savings Bank (TSFB) held in the name of Paul J. Manafort, Jr. (the Target TFSB Account).

4.     For the reasons stated herein, there is probable cause to believe that the Target Assets are subject to seizure and forfeiture to the United States pursuant to, among other statutes, 21 U.S.C. § 853, 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) (a)(2), and  28 U.S.C. § 2461(c).

## III.   Relevant Legal Authority

5.     Section 853(f) of Title 21 of the United States Code provides that the Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture in the same manner as provided for a search warrant. It further provides that if "the court determines that there is probable cause to believe that the property to be seized would, in the event of

conviction, be subject to forfeiture and that an order under subsection (e) [relating to issuance of a protective order] may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property." Pursuant to Section 853(l), a court has jurisdiction without regard to the location of the property which may be subject to forfeiture.

6.   Section 981(a)(1)(C) of Title 18 of the United States Code provides that property that constitutes or is derived from proceeds traceable to an offense that is a "specified unlawful activity" as defined in section 1956(c)(7), or conspiracy to commit such an offense, is subject to forfeiture.[1]   Among the "specified unlawful activit[ies]" enumerated in section 1956(c)(7) are felony violations of the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611 *et seq.* FARA, in turn, requires every person who acts as an agent of a foreign principal to register, within ten days, with the Attorney General, and it criminalizes willfully acting as an agent of a foreign principal in the absence of such registration.

7.   Section 982(a)(1) of Title 18 of the United States Code provides that a court, "in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."[2]   Section 1956 prohibits, among other things, conducting financial transactions affecting interstate and foreign commerce,

---

[1] Although section 981 is denominated a civil forfeiture statute, section 2461 of Title 28 provides, among other things, that if a defendant is convicted of an offense giving rise to civil forfeiture, the court "shall order forfeiture of the property as part of the sentence in the criminal case."

[2] I am advised that legitimate or untainted property, including commingled funds, may be forfeited in a money laundering case "if the legitimate funds were somehow involved in the offense, such as by helping to conceal that illegal funds." *See United States v. Aguasvivas-Castillo*, 668 F.3d 7, 17 (1st Cir. 2012).

knowing that the property involved in the financial transactions represents the proceeds of some form of unlawful activity, and the transactions in fact involved the proceeds of specified unlawful activity, (i) with the intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986, or (ii) knowing that the transaction is designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity. Section 1956(h) further criminalizes a conspiracy to commit any of the substantive offenses in section 1956, including the offenses described immediately above.

## IV. Probable Cause

8. As set forth below, there is probable cause to believe that the Target Assets are subject to forfeiture: (1) pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. 2361(c), as property traceable to the proceeds of specified unlawful activity, to wit, FARA violations, and (2) pursuant to 18 U.S.C. § 982(a)(1), as property involved in a section 1956(h) money laundering conspiracy to, among other things, knowingly conduct financial transactions affecting interstate commerce with the proceeds of specified unlawful activity, knowing that the financial transactions represented the proceeds of some form of unlawful activity and (i) with the intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986 or (ii) knowing the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity.

A. Manafort's and Gates' Lobbying Work on Behalf of Ukrainian Officials

9. Manafort and Gates have been employed for many years through DMP International LLC and related entities as lobbyists and political consultants, working both in the United States and internationally. Manafort created DMP International LLC and Davis Manafort International, LLC (collectively, DMI) to engage in work for foreign clients—in particular

political consulting and lobbying for Ukraine. Beginning in or about 2005 and at least until 2014, Manafort provided political consulting services to the Ukrainian Party of Regions, including Viktor Yanukovych, head of the Party of Regions and the President of Ukraine from 2010 to 2014. The Party of Regions was a pro-Russia political party in Ukraine. In 2014, Yanukovych fled Ukraine for Russia in the wake of popular demonstrations that protested, among other things, widespread governmental corruption.

10.     Gates told the FBI in an interview in July 2014 that he was hired by Manafort in 2006 and that he worked on Ukrainian elections and gave policy advice, up to the time of the interview. Gates advised that in 2010, he and Manafort were in Ukraine for over two months leading up to the election that brought Yanukovych to power. ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

11.     As explained below, documents and other information gathered in the investigation evidence that one aspect of DMI's and Manafort's work for the Party of Regions was to advance the interests of the Party of Regions and Viktor Yanukovych in the United States – activity that triggered an obligation to register as a foreign agent under FARA.

> a. *DMI's Work with a United States Public Relations Firm on Behalf of the Party of Regions*

12.     ████████, Davis Manafort International, LLC engaged ██████ █ ████████ ████████, a United States public relations firm, to provide communications services in connection with its work for the Party of Regions and Yanukovych. More particularly, documents show that Davis Manafort International, LLC retained ██████ to develop a communications campaign to increase the visibility of Prime Minister Yanukovych in the United States and Europe.

Bank statements obtained from ████████ show that ████████ invoiced Davis Manafort International, to Manafort's attention, for this work beginning in at least June 2007 and continuing through at least October 2007. The invoices describe the work performed as "Prime Minister Yanukovych Cpgn."



13. ████████████████████████████████████████████████████████ A search of the United States Department of Justice database of all agents currently or previously registered under FARA shows that Davis Manafort International and Manafort failed to register their 2007 work to advance the interests of the Party of Regions and Yanukovych in the United States.

   b. *Evidence of DMI's Work on Behalf of the Party of Regions in the United States in 2005*

14. There is also evidence that Manafort was engaged in efforts to advance the interests of the Party of Regions prior to the engagement of ████████ in 2007. In response to a grand jury subpoena, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

3 ████████████████████████████████████████████████████████████████████████

15.     In the first of the two Akhmetov memoranda, dated June 2, 2005, Manafort reported on a meeting he had with the coordinator of United States-Ukraine policy at the National Security Council. Manafort also circulated to Akhmetov and others copied on the memorandum a set of attached "Talking Points that are being circulated by the US government to use in meetings with Ukraine Government officials," which "reflect[] the policy of the Bush Administration." Manafort cautioned that "[i]t is very important that we do not let these Talking Points get leaked to anyone outside of our very limited circle. If this paper is leaked, it will totally compromise my position in Washington."

16.     The second Akhmetov memorandum, dated July 6, 2005, was titled "Evolution of US Policy to Ukraine." In that memorandum, Manafort summarized developments in United States policy toward the then-President of Ukraine Viktor Yushchenko, who was a political opponent of Yanukovych. Manafort concluded by advising Akhmetov that "[o]ur strategy in the United States is working."

17.     

The April 12, 2017 Associated Press article reported that DMI records showed that at least two payments were made to DMI that correspond to payments noted in the "black ledger." Following publication of that article, Manafort through a spokesman said that he had been paid according to his clients' "preferred financial institutions and instructions."



c.  *Manafort's Knowledge of the FARA filing requirement at least as early as 2007*

18.     The investigation has established that Manafort was aware of the requirement that individuals performing work on behalf of foreign principals in the United States must register under FARA.



19.     There is also documentary evidence that, at least as early as 2007, Gates and Manafort were aware of and discussed the requirement that persons acting on behalf of a foreign principal in the United States register under FARA.





20. ███████ █████ ████ ███████████ ████ ███ ██
████ ████ █ ██ ████ ███ █ ████ ██ ████ █ ████ ███ ████ █ ███
██ ██████ As indicated above, however, a search of the FARA database shows that

DMI, Manafort, and Gates ultimately did not register under FARA during this time period.

     d.   *DMI's Lobbying in the United States Through* ███████ *and* ██████████ *in 2012-2014*

21.    In 2012, as part of their work on behalf of the Party of Regions, Gates, Manafort, and DMI engaged two U.S. lobbying firms with offices in Washington, D.C., ███████ ███ ███████ ███ and █████████ █ ██████ ████████ ), to perform lobbying activities in the United States. Both firms worked directly with Manafort and Gates and through an entity that was created for this purpose named the European Centre for a Modern Ukraine (ECFMU).

22.    The evidence that the FBI has collected in this investigation establishes that the ECFMU was created in 2012 as an arm of the Government of Ukraine, Yanukovych, and/or the Party of Regions, and was used to distance Yanukovych and the Party of Regions from the work being performed by ███████ and ███████ ████ in the United States. The ECFMU was created to lobby and conduct a public relations campaign in the United States and Europe on behalf of the

existing Ukraine regime.  It was headquartered in Belgium, and had as its "Managing Director"

██ ██ █████   The ECFMU ceased to operate upon the downfall of Yanukovych in 2014.

23.   In an email dated ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

24.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

a.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

b.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

_____

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████



c.

d.

25.     Bank records and documentation obtained from ███████ and ██ ██████ ███

show that the two lobbying firms were paid for their services through various off-shore accounts

associated with Manafort entities, including Bletilla Ventures Limited (in Cyprus) and Global

Endeavour Inc. (in the Grenadines).  In total, ███████ and the ██████ ████ were paid more than

$2,000,000 from these off-shore accounts between 2012 and 2014.  These payments served to

promote the lobbying work of Manafort, Gates, ██████, and ██ ██████ ██████.

26.     A search of the United States Department of Justice database of all agents currently or previously registered under FARA, conducted in July 2017, disclosed that Manafort, Gates, and their affiliated entities, including DMI, failed to register as agents of a foreign principal for their work on behalf of the Party of Regions, Ukraine, and Yanukovych until June 27, 2017.[6] Accordingly, I submit there is probable cause to believe that funds earned from the Party of Regions represent proceeds of a FARA offense.

B.  Manafort and Gates' Use of Overseas Accounts to Receive Payment for Services from Ukrainian Officials.

27.

28.     In an interview with the FBI in 2014, Gates admitted that he was directed to open accounts in Cyprus by President Yanukovych's Chief of Staff Boris Kolesnikov. He was told that it was easier for Gates and Manafort to be paid from one Cyprus account to another Cyprus account. Gates said that various oligarchs would chip in to pay them for their consulting work. Gates identified Lucicle, Bletilla, Leviathan, and Global Endeavor (among others) as accounts opened to receive such payments.

---

[6] The database is publicly available at https://www.fara.gov/.

29.    Pursuant to a mutual legal assistance treaty (MLAT) request, the FBI has obtained bank records associated with Cypriot accounts held in the name of various legal entities affiliated with Manafort and Gates.  A review of the bank records obtained to date disclosed the following beneficial ownership and signature authority over pertinent entities and accounts:

| BANK | ACCOUNT NAME | BENEFICIAL OWNER(S) | SIGNATORY[7] |
|---|---|---|---|
| Bank of Cyprus | Yiakora Ventures Ltd. | Manafort | |
| | Lucicle Consultants Ltd. | Gates | Manafort, Gates |
| | Actinet Trading | Manafort | Manafort, Gates |
| | Black Sea View Ltd. | Gates | |
| | Bletilla Ventures Ltd. | Manafort | |
| | EVO Holdings Ltd. | Gates | |
| | PEM | Gates | |
| | Global Highway Ltd. | Gates | |
| | LOAV Advisors Limited | Manafort/Gates | |
| | Leviathan Advisors Ltd. | Gates | |
| | Peranova Holdings Ltd. | Gates | |
| Hellenic Bank | Actinet Trading | Gates | |
| | Bletilla Ventures Ltd. | Gates/Kilimnik | |
| | Lucicle Consultants Ltd. | Gates | |
| | Marziola | Kilimnik | |
| | Olivenia Trading | Gates/Kilimnik | |

---

[7] Where no signatory is listed, bank records indicate that the signatory was a Cypriot individual(s).

C. Laundering of the Proceeds of DMI's Work for the Party of Regions into the United States

30.     Bank records and other documents show that from 2008 to 2014, at least 200 wires totaling more than $12,000,000 were sent to various vendors in the United States for personal goods and services provided to Manafort, from various Cypriot and other overseas accounts:

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Vendor A | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| (Home Improvement Company/General Contractor in the Hamptons, New York) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova Holdings Limited | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | *Unknown* | Grenadines | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Vendor A Total** | **$5,434,793** |
| Vendor B | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| (High-End Home | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| Automation, | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| Lighting and | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| Home | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| Entertainment | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| Company in | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| Florida) | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 11/5/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | | | **Vendor B Total** | **$1,319,281** |
| Vendor C | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| (Antique Rug | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |
| Store in | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| Alexandria, | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| Virginia) | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Vendor C Total** | **$934,350** |
| Vendor D (Related to Vendor C) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| Vendor E | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Men's Clothing Store in New York) | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |
| | 10/15/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/24/2014 | Global Endeavour Inc. | Unknown | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | Vendor E Total | $849,215 |
| Vendor F (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Vendor F Total** | **$655,500** |
| Vendor G (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | **Vendor G Total** | **$623,910** |
| Vendor H (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | **Vendor H Total** | **$520,440** |
| Vendor I (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | **Vendor I Total** | **$500,000** |
| Vendor J | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Contractor in Florida) | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | **Vendor J Total** | **$432,487** |
| Vendor K (Landscaper in the Hamptons, New York) | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | | | **Vendor K Total** | **$164,740** |
| Vendor L ((1) Purchase of 2012 Range Rover; (2) Down Payment for Leased 2012 Range Rover LR4; (3) Purchase of 2012 Range Rover) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Vendor L Total** | **$163,705** |
| Vendor M (Contractor in Virginia) | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |

| Payee | Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | **Vendor M Total** | **$125,650** |
| Vendor N<br><br>(Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, NY) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Vendor N Total** | **$112,825** |
| Vendor O<br><br>(Purchase of 2013 Mercedes Benz SL550) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Vendor O Total** | **$62,750** |
| Vendor P<br><br>(Purchase of 2008 Land Rover Range Rover | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Vendor P Total** | **$47,000** |
| Vendor Q<br><br>(Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| Vendor R<br><br>(Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| Vendor S<br><br>(Housekeeping in New York) | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

31.     Bank records and property transaction records also show that Manafort caused funds to be sent from overseas accounts into accounts in the United States for use in purchasing real property.  For example, email communications show that on or about August 30, 2012, Manafort advised a real estate agent involved in the purchase of a house in Arlington, Virginia, that "$1.9M should be in your escrow account tomorrow morning.  It is coming from Lucille [sic] LLC."  Bank and property transaction records confirm that on or about August 31, 2012, a wire in the amount of approximately $1,900,000 was sent from a Cyprus account held by Lucicle Consultants Limited to a law firm in Virginia for the purchase of a house in Arlington, which was titled in the name Manafort's daughter Andrea.

32.     Documents obtained in the investigation evidence that Manafort and Gates communicated about the overseas accounts and that Manafort maintained approval authority over the movement of funds in the accounts.  For example, in an email exchange between Manafort and Gates in late November 2011, which was obtained pursuant to a search warrant, Gates and Manafort discussed the movement of funds to and from the Leviathan and Peranova accounts.  On November 28, 2011, Gates emailed Manafort that he planned to "transfer the money from the Levi account to DMP Intl unless you direct otherwise."  Based on context, I believe that "Levi" refers to Leviathan Advisors.  One day later, Gates advised Manafort that he would move $328,000 from the "Levi" account to Peranova in order to pay bills.  In response, Manafort approved the transactions proposed by Gates.

33.     A review of Manafort's tax returns for 2010 through 2014 shows that, although Manafort declared payments made from the Cypriot and other overseas accounts to certain bank accounts in the United States held by DMI as income to DMI, Manafort did not report the direct

vendor payments described above.  In at least 2010 through 2014, Manafort also submitted a Schedule B form, which required him to declare whether he had "an interest in or a signature [] authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  Each year, Manafort declared "No."  Work papers obtained from tax accountants at KWC, a Virginia firm that prepared Manafort's taxes, show that on or about October 4, 2011, a tax preparer emailed Manafort with several questions, including the following: "At any time during 2010, did you, Kathy, Andrea or Jessica have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account."  Manafort responded "NO."

34.    Based on email communications between Gates and Manafort, and between Gates and KWC, I know that both Gates and Manafort were involved in the preparation of Manafort's taxes.  For example, in an email dated May 11, 2015, Gates mentioned receipt of a Schedule K-1 that reported the income, losses, and dividends for one of Manafort's business entities.  Gates stated that he would speak to Philip Ayliff, one of Manafort's tax preparers at KWC, to "see if we can alter some of the income coming into you."

35.    The FBI has also identified additional communications sent by Manafort and Gates in furtherance of the scheme to conceal the existence of overseas accounts from Manafort's tax preparers and United States authorities, thereby facilitating the concealment of the income flowing from those accounts to vendors.  These emails include the following:

a.  On or about October 2, 2015, a tax accountant at KWC emailed Gates about "pending matters" related to Manafort's tax return, including the query: "Foreign bank disclosure ??? has it changed from last year?"  On or about October 7, 2015, Gates responded in relevant part: "[N]othing has changed on the foreign bank

disclosure form." At the request of the tax accountant, Gates also attached to the email a signed copy of Manafort's engagement letter with KWC for tax year 2014.

b. On or about October 3, 2016, MANAFORT's tax preparer emailed the following question in connection with the preparation of MANAFORT's tax returns: "Foreign bank accounts etc.?" MANAFORT responded on or about the same day: "NONE."

36.     Two of Manafort's tax preparers from KWC have advised the FBI that they were not aware that Manafort controlled any foreign accounts; otherwise they would have required these accounts to be reported on the tax returns. They also testified that, although they saw some payments by, and loans from, certain of the Cyprus entities listed in the table above (i.e., payments and loans that were recorded on Manafort's tax returns), they understood that these Cyprus entities were independent third parties rather than affiliates of Manafort or DMI.

37.     Manafort further failed to report these vendor payments to the United States government in connection with his obligation to register for his work in the United States on behalf of the Ukrainian Party of Regions, the Ukraine government, and Yanukovych pursuant to FARA. As noted above, there is evidence that Manafort worked to advance the interests of the Party of Regions and Yanukovych in the United States over an extended period, including through ▮▮▮ in approximately 2007 and through ▮▮▮ and ▮▮▮▮ in approximately 2012 to 2014. A July 2017 search of the United States Department of Justice database of all agents currently or previously registered under FARA disclosed that DMI failed to register as an agent of the relevant foreign government and political party until June 27, 2017.

38.     Pursuant to FARA, individuals acting on behalf of a foreign principal such a foreign government or foreign political party are required not only to register with the Attorney General, but also to disclose information about the nature of their lobbying work on behalf of the foreign

principal and the income and other compensation received therefrom. By failing to register under FARA until 2017 for lobbying work he performed in 2012 to 2014, Manafort avoided having to disclose the details of his compensation from the Party of Regions to the Attorney General until 2017.

39.     On or about June 27, 2017, DMI's FARA registration papers were submitted to the FARA Unit of the Department of Justice's National Security Division. In those forms, DMI, Manafort, and Gates reported that they acted or agreed to act on behalf of the Party of Regions in 2012 through early 2014. No mention was made of any work performed prior to 2012.

40.     The registration forms required DMI to report, during various six-month periods for which it acted on behalf of the Party of Regions, the dates, amounts, and purpose(s) of any "contributions, income or money either as compensation or otherwise" received from the Party of Regions. DMI reported receipt of approximately $17 million from the Party of Regions between January 2012 and January 2014. DMI's FARA registration failed, however, to disclose the payments sent directly to United States vendors for Manafort's benefit, from many of the same Cypriot and other overseas accounts that, bank records show, were also used to transfer roughly $17 million to DMI.

D. The Target Assets Were Involved in the Money Laundering Conspiracy

41.     As set forth below, there is probable cause to believe that the Target Assets are involved in the money laundering conspiracy described above and are therefore subject to forfeiture.

1.  The Target       Account

42.     As set forth below, there is probable to believe that $3,755,892.64 in funds in the Target       Account are traceable to property involved in a money laundering conspiracy in

violation of 18 U.S.C. § 1956(h).   In particular, as set forth below, there is probable cause to believe that the Target ▇▇▇▇ Account is traceable to a 2008 wire transfer of approximately $8,000,000 from the Cypriot account of Yiakora Ventures to the U.S. bank account of an entity affiliated with Manafort (the $8 million wire), which transfer was part of the money laundering conspiracy described above.

### a.   The $8 Million Wire from Yiakora Ventures

43.     Documents obtained from First Republic Bank (FRB), where Manafort maintained numerous accounts (in his name and in the name of various entities) between at least 2005 and 2014, show that Manafort opened an account in the name of Jesand Investment Corporation (Jesand) in or around May 2008.  Jesand was incorporated in Virginia in 2002, and according to KWC witnesses, its name is an amalgamation of Manafort's two daughters: Andrea and Jessica. Records obtained from KWC show that KWC performed tax work for Jesand.

44.     In or around the same time that Manafort opened the Jesand account at FRB, Manafort also caused FRB to open accounts in the names of his two daughters, Jessica and Andrea Manafort.

45.     Bank records show that on or about June 4, 2008, a wire transfer in the amount of approximately $8,000,000 was sent from a bank account at Bank of Cyprus held in the name of Yiakora Ventures Limited (Yiakora Ventures) to the recently-opened Jesand account at ▇▇▇ (Jesand Account).  ▇▇▇ ▇▇ ▇▇ ▇▇▇ ▇▇▇▇ ▇▇▇▇ ▇▇▇
▇▇▇▇ ▇▇ ▇▇ ▇▇▇ ▇ ▇▇▇ ▇▇ ▇▇ ▇▇ ▇ ▇
▇▇▇ ▇ ▇▇▇▇▇ ▇▇ ▇▇ ▇ ▇▇▇
▇▇ ▇ ▇ ▇▇ ▇▇ ▇▇▇ ▇ ▇▇▇ ▇▇▇▇▇
▇▇▇▇ ▇ ▇▇ ▇▇ ▇

46.    As indicated above, account records for the Yiakora Ventures account obtained from Cyprus pursuant to an MLAT request show that Manafort was the stated beneficial owner of Yiakora Ventures.

47.    Records obtained from KWC show that Manafort did not report the $8 million wire from Yiakora Ventures as income on his tax return in 2008 or thereafter. Instead, the bookkeeping records for Jesand, a copy of which was provided to KWC on a yearly basis, recorded the payment as a liability, *i.e.*, as a loan from Yiakora Ventures to Jesand.

48.    Jesand Investment Corporation was liquidated in 2011. Following that liquidation, the supposed "loan" from Yiakora Ventures to Jesand was transferred to Paul and Kathleen Manafort's balance sheet.

49.    However, an initial version of Paul & Kathleen's Assets and Liabilities for the year ending December 31, 2013, which was prepared by bookkeepers at Nigro Karlin Segal & Feldstein (NKSFB) omitted any reference to a liability to Yiakora Ventures. Documents obtained from KWC show that one of Manafort's tax accountants, Philip Ayliff, emailed Heather Washkuhn at NKSFB on or about September 5, 2014 with an attachment titled, "Paul and Kathy Manafort[:] Questions/comments relating to the 2013 general ledger and statements provided by Heather and after feedback by Rick Gates." The document identified several "[u]nrecorded liabilit[ies] that needed to be added" to the Statement of Assets and Liabilities. Among others, it listed: "From the old Jesand Investment Corp – this entity was liquidated at the end of 2011. The following should still be on Paul's balance sheet as liabilities: [] Yiakora Ventures loan (JIC) of $8,120,000."

50.    A later version of the Assets and Liabilities for Paul and Kathleen Manafort for the year ending December 31, 2013 records a liability to Yiakora Ventures of $8,120,000.

51.    Ayliff informed the FBI that:

-26-

a. he understood that Yiakora Ventures was a third party, rather than an entity affiliated with Manafort;

b. it would have been relevant to him if Yiakora Ventures was in fact affiliated with Manafort;

c. if the loan were not a true loan, it would need to be recorded as income;

d. if the loan were wiped off the balance sheet, for example if it were to be forgiven, it would then have to be reported as income; and

e. one of his concerns about Manafort's taxes over the years was the number of loans from various entities, which were not being recorded as income, but which he had been led to believe were legitimate loans.

52.     According to a Statement of Assets and Liabilities for Paul and Kathleen Manafort for the year ending December 31, 2016, a copy of which was obtained from KWC, the $8,120,000 "loan" from Yiakora Ventures had not been paid off by the end of 2016 and was still being recorded as a liability in the same amount, *i.e.*, with no additional interest due.

    *f.   Nexus to the Target* ▉▉▉▉ *Account*

53.     There is probable cause to believe that funds up to and including $3,755,892.64 in the Target ▉▉▉▉ Account are traceable to the approximately $8 million in undeclared income previously held in a Cypriot bank account in the name of Yiakora Ventures,[8] which was then transferred into the United States via international wire from Yiakora Ventures to Jesand.

54.     On or about the same day that $8 million was transferred from Yiakora Ventures to the Jesand FRB Account, $7,650,000 was transferred from the Jesand FRB Account to a money

---

[8] Based on the evidence described above, the $8 million in the Yiakora Ventures account is believed to have been payment for services, including lobbying, provided to DMI for work on behalf of the Ukraine and other foreign countries.

market account at FRB held in Jesand's name (Jesand MMA Account). Bank statements show that, of the $7,650,000 transferred into the Jesand MMA Account, $3,000,000 was transferred to an FRB-Pershing account held by Andrea Manafort and $3,000,000 was transferred to an FRB-Pershing account held by Jessica Manafort. These transfers took place on or about June 10, 2008, a few days after the original $8,000,000 wire, and they were the first significant deposits into Jessica and Andrea Manafort's FRB-Pershing accounts.

55. 

56.     The use of the majority of the $8 million Yiakora Ventures wire to fund bank accounts in Manafort's daughters' names did not match the payment details on that wire, which, as noted above, read: "SHAREHOLDER FUNDS FOR EXISTING PROJECT WORK." In my training and experience, the use of false wire details evidences an intent to conceal the nature, origin, or other facts about a transaction.

57.     Bank records show that on or about July 18, 2014, securities and/or cash valued at $4,297,812.67 were transferred from ▬▬▬ Manafort's ▬▬▬▬▬ Account to an account at ▬▬▬ with account number ▬▬▬▬, for which ▬▬▬ Manafort was the stated owner ▬▬ ▬▬▬▬▬). Bank records show no significant deposits into ▬▬▬ Manafort's ▬▬▬ Account between the time of the $3,000,000 deposit from Jesand and the transfer of approximately $4,297,812.67 in assets to ▬▬▬▬ ▬▬▬.

58.     ▬▬▬ initiated the process of exiting its relationship with Manafort and his family members, including ▬▬▬ Manafort, in or around the summer of 2017. According to documentation obtained from ▬▬▬ on or about October 4, 2017, approximately $3,755,892.64

was transferred from UBS Account ████ o a newly opened account at ████ held in the name of ████ and ████, with account number ████ (*i.e.*, the Target ████ Account). Bank records for ████ show no significant deposits between the receipt of the approximately $4,297,812.67 described above and the transfer of approximately $3,755,892.64 million to the Target ████ Account. Accordingly, there is probable cause to believe that $3,755,892.64 in the Target ████ Account is traceable to property involved in a money laundering conspiracy.

### 2. The Target ████ Account

59.    As set forth below, there is probable cause to believe that funds up to and including $271,000 in the Target ████ Account are traceable to property involved in money laundering, to wit, a mortgage on real property in the Hamptons, New York that was involved in the money laundering conspiracy. The property is located at ████ Water Mill, New York (the Hamptons property). (Documents often list the address as being located in the adjacent hamlet of Bridgehampton, rather than Water Mill).

60.    Based on bank records, vendor invoices, other documentation, and interviews, I conclude that between approximately 2008 and 2014, at least 71 wire transfers totaling approximately $5.3 million were sent from various Cypriot and other overseas entities to S.P. & C. Home Improvement, Inc. (S.P. & C.), a home improvement business then based in Quogue, New York in the Hamptons. Of this amount, approximately $1,015,000 was sent to S.P. &. C during 2012 and approximately $1,190,000 was sent during 2013—years during which DMI was engaged, through ████ and the ████ in lobbying efforts in the United States on behalf of the Party of Regions, the Ukraine government, and President Yanukovych. The payments to S.P. & C. are summarized below:

-29-

| Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|
| 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |

| Transaction Date | Originating Account | Country of Origination | Amount of Transaction |
|---|---|---|---|
| 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| 3/28/2012 | Peranova Holdings Limited | Cyprus | $37,500 |
| 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| 4/22/2014 | *Unknown* | Grenadines | $56,293 |
| 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| Total | | | **$5,434,793** |

61.     The person who owned S.P. & C. during the relevant time period told the FBI that the majority of payments he received from Manafort were for work related to the Hamptons property.[9]     This work included significant remodeling of the Hamptons property.  He further indicated that his bank account was frozen as a result of the bank's concerns about his receipt of incoming foreign wires from Manafort.  Copies of invoices and bank statements obtained from S.P. & C. confirm that the funds from Cypriot and other overseas accounts were sent to S.P. & C. in payment for its services.  For example, an invoice shows that Manafort was billed $298,000 as a "[d]eposit" on a pool house for the Hamptons property.  That invoice is stamped "PAID" on November 20, 2012.  Bank records show that Lucicle Consultants wired $298,000 from its account at Cyprus Popular Bank to S.P. & C. on or about November 20, 2012.

62.     A review of Manafort's tax returns shows that, at a minimum, Manafort failed to report these payments to the IRS from in or about 2010 through 2014.

63.     After spending millions of dollars on improvements to the Hamptons property using money from Cypriot and other overseas accounts, Manafort sought and obtained a $3.5 million mortgage on the property from Spruce Capital in or about August 2016.  This mortgage on the Hamptons property allowed Manafort to obtain cash against the millions of dollars in payments that he invested in the property.  Based on my training and experience, I know that investing in real estate and then obtaining mortgages on that property is one way of obscuring the source and nature of funds.

---

[9] Some payments were related to work performed for Manafort on other properties.  For example, the wire payment of $375,000 sent to S.P. & C. in March 2013 was for the construction of another house in the Hamptons, which, according to the owner of S.P. & C, was built at Manafort's direction on land held in the names of Manafort's in-laws.

64.     According to documents furnished by Spruce Capital, the mortgage that Manafort obtained on the Hamptons property yielded $3,264,536.04 in cash proceeds, which were paid to Manafort's UBS account number ▆▆▆ on or about August 29, 2016. There is probable cause to believe that a portion of these funds, totaling $271,000, was ultimately transferred into the Target ▆▆▆ Account, based on the following: (a) on or about September 12, 2016, Manafort wired approximately $500,000 from UBS account ▆▆▆ to an account at ▆▆▆ held in Kathleen Manafort's name, with an account number ending ▆▆▆; (b) approximately one day later, on or about September 13, 2016, approximately $271,000 was transferred from Kathleen Manafort's ▆▆▆ account to another of her accounts at the same bank with account number ▆▆▆ (that is, the "Target ▆▆▆ Account").

65.     Kathleen Manafort is identified as a housewife on her and Manafort's joint tax returns. Ayliff has stated that Kathleen Manafort did not have any income-generating work.

### 3.  The Target TFSB Account

66.     As set forth below, there is probable cause to believe that funds up to $1,100,637 in the Target TFSB Account are also funds traceable to the Hamptons property, which was involved in a money laundering conspiracy.

67.     Between approximately 2008 and 2014, at least 68 wire transfers totaling approximately $5,000,000 were sent from various Cypriot and Saint Vincentian entities to S.P. & C. for remodeling and other work related to the Hamptons property. Some of these payments came from entities that Manafort identified to the FBI as having been used to receive payments for his services to the Party of Regions. By causing these payments to be sent directly to S.P. & C from undeclared overseas accounts, Manafort was able to hide these payments from his bookkeepers,

tax accountants, and the United States government, thereby allowing him to avoid paying taxes on the funds.

68.     In approximately November 2016, Paul and Kathleen Manafort (through a holding company called Summerbreeze LLC) secured a mortgage loan from TFSB in the amount of $9.5 million (the TFSB loan). The Manaforts used the remodeled Hamptons property, with a stated appraised value of $13,500,000, as collateral to obtain this loan. (This loan is in addition to the Spruce Capital loan described above). The TFSB loan was also secured by a Manafort residence in Alexandria, Virginia (with a stated appraised value of $2,700,000), and a checking account at TSFB with account number ending -████ (which was required to maintain a balance of at least $630,000). As with the Spruce Capital loan, the TFSB loan allowed Manafort to draw cash out of the Hamptons property, into which he had invested millions of dollars in undeclared payments from overseas.

69.     On or about November 23, 2016, approximately $5,016,636.10 in loan proceeds traceable to the Hamptons property was deposited into Manafort's bank account at TFSB ending with account number -████ (the TSFB Manafort account). The description of the deposit on the bank statement matches the loan number for the TFSB loan. On or about December 7, 2016, Manafort transferred $5,000,000 from the TFSB Manafort account to the Target TFSB Account. As of approximately September 7, 2017, bank records show the net value of the Target TFSB Account was $1,100,637.

***

70.     For the foregoing reasons, I respectfully submit that there is probable cause to believe that the Target Assets are subject to forfeiture, because they are traceable to proceeds of

specified unlawful activity and are traceable to property involved in a money laundering conspiracy.

71.     Further, I respectfully submit that a restraining order pursuant to 21 U.S.C. § 853(e) will not be sufficient to preserve the Target Assets for forfeiture, given the ease with which funds may be moved via wire transfer, electronic funds transfer, or otherwise. Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because, among other reasons, the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically; the bank representative fails to notify the proper personnel as to the existence of the order; or the bank exercises a right of setoff to satisfy an outstanding debt owed to the bank by the account holder.[10]

72.     The evidence relating to Manafort's frequent movement of funds between various accounts and his concealment of financial information from his bookkeepers, tax preparers, and United States authorities further demonstrates that a seizure warrant is reasonably necessary to ensure that neither Manafort nor his family members are able to transfer, repatriate, or otherwise dissipate or conceal the Target Assets. As described above, Manafort has frequently transferred funds between numerous domestic and foreign accounts held in various names. Moreover, the funds in the Target ▪▪▪▪ Account were moved in a single wire transfer within the last month.[11]

---

[10] Upon execution of the seizure warrants, law enforcement will adhere to the following protocols, which I understand are consistent with the FBI's handling of funds seized pre-conviction: upon receipt of the funds from the financial institution, law enforcement will deliver the funds to the U.S. Marshals Service ("USMS"), which will take receipt of the funds. The money will then be held in escrow in the Seized Assets Deposit Fund until a subsequent judicial order. This protocol will ensure the funds' continued availability until their ultimate disposition is determined.

[11] 

Additionally, the evidence indicates that Manafort deliberately concealed information about his finances, including the existence of foreign accounts, from his bookkeepers, tax preparers, and U.S. authorities. As noted above, this concealment persisted until at least June 2017. Manafort's demonstrated history of maintaining secret foreign accounts raises a risk that, in the absence of a seizure warrant, the Target Assets may be transferred overseas. A seizure warrant is thus reasonably necessary to ensure that the property remains available for forfeiture. *See* 21 U.S.C. § 853(f) (authorizing criminal seizure warrants where, among other requirements, a court determines that a protective order under section 853(e) "may not be sufficient to assure the availability of the property for forfeiture").

73. Given the confidential and highly sensitive nature of this ongoing criminal investigation, I further request that this affidavit and associated papers be sealed until further order of the Court.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Sworn to before me on
October 27, 2017

THE HONORABLE BERYL A. HOWELL
CHIEF UNITED STATES DISTRICT JUDGE